AMERADA HESS PIPELINE CORPORA-
TION, BP Pipelines (Alaska) Inc., Cono-
coPhillips Transportation Alaska, Inc.,
ExxonMobil Pipeline Company, Koch
Alaska Pipeline Company, LLC, Mobil
Alaska Pipeline Company, and Unocal
Pipeline Company, Appellants,

v.

REGULATORY COMMISSION OF ALAS-
KA, Tesoro Alaska Company, and
Williams Alaska Petroleum, Inc., Appel-
lees.

No. S–12230.

Supreme Court of Alaska.

Feb. 15, 2008.

Louis R. Veerman, Pamela D. Weiss, Molly C. Brown, Guess & Rudd, P.C., Anchorage; Steven H. Brose, Steven Reed, Steptoe & Johnson LLP, Washington, D.C.; Albert S. Tabor, Jr., John E. Kennedy, Vinson & Elkins, L.L.P., Houston, Texas, for Appellants Amerada Hess Pipeline Corporation, BP Pipeline (Alaska) Inc., ConocoPhillips Transportation Alaska, Inc., ExxonMobil Pipeline Company, Mobil Alaska Pipeline Company, and Unocal Pipeline Company.

Tina M. Grovier, Birch, Horton, Bittner & Cherot, Anchorage; John B. Rudolph, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Washington, D.C., for Appellant Koch Alaska Pipeline Company, LLC.

Charles E. Cole, Law Offices of Charles E. Cole, Fairbanks; Stephan H. Williams, Anchorage, for Appellee Regulatory Commission of Alaska.

Robin O. Brena, David W. Wensel, Brena, Bell & Clarkson, P.C., Anchorage, for Appellee Tesoro Alaska Company.

Douglas S. Parker, Preston, Gates & Ellis LLP, Anchorage; Randolph L. Jones, Jr., Conner & Winters, Tulsa, Oklahoma, for Appellee Williams Alaska Petroleum, Inc.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

PER CURIAM.

The Regulatory Commission of Alaska ("RCA") determined that the shipping rates charged by the owners of the Trans–Alaska Pipeline were unjust and unreasonable from 1997 through 2000 and ordered refunds for that period. The owners appealed to the superior court, which affirmed, and now appeal to this court. They make the following four arguments:

1. The RCA inappropriately based its rate calculations on depreciation data from a contract between the pipeline's owners and the State.

2. The RCA's decision violated the rule against retroactive ratemaking by making its order enforceable from the time when the rates were first challenged (1997) and not from the time of the order (2002).

3. The RCA provided an unreasonably low rate of return considering the risks involved with investment in the pipeline.

4. The RCA violated due process by retaining an economic advisor who four years earlier wrote a master's thesis arguing that the pipeline's rates were too high.

The owners' arguments on appeal are generally the same as those they presented to the superior court. We conclude that the superior court correctly resolved these arguments and therefore adopt the opinion of the superior court as set forth in the appendix.

The opinion of the superior court is AFFIRMED.

BRYNER, Justice, not participating.

APPENDIX

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

AMERADA HESS PIPELINE CORPORATION, BP PIPELINE (ALASKA) INC.,

EXXONMOBIL PIPELINE COMPANY, MOBIL ALASKA PIPELINE COMPANY, PHILLIPS TRANSPORTATION ALASKA INC., UNOCAL PIPELINE COMPANY, WILLIAMS ALASKA PIPELINE COMPANY LLC, and the STATE OF ALASKA,

Appellants,

vs.

REGULATORY COMMISSION OF ALASKA,

Appellee.

Case No. 3AN–02–13511 CI

RCA Docket Nos. P–97–4, P–97–7

### DECISION AND ORDER *

### I. FACTS AND PROCEEDINGS

Appellees Tesoro Alaska Company ("Tesoro") and Williams Alaska Petroleum Inc. ("Williams," or collectively "the shippers"), refiners of North Slope oil, protested to appellee Regulatory Commission of Alaska ("RCA") 1997 intrastate rates for the Trans Alaska Pipeline System ("TAPS"). The appellants ("the TAPS Carriers") are subsidiaries of major oil producing companies;[1] they hold title to undivided joint interests in the pipeline, and certificates of convenience to operate the pipeline. They delegate physical operations and maintenance to their wholly owned agent, the Alyeska Pipeline Service Corporation ("Alyeska").

RCA decreed the challenged rates provisional and subject to refund. Following extensive administrative proceedings, RCA promulgated Order No. 151 in Docket P–97–4.[2] Order No. 151 exceeds two hundred pages. Twenty-six years into TAPS's life, Order No. 151 for the first time set fully litigated, rather than settlement-generated, intrastate rates. RCA concluded that the 1997–2000 intrastate TAPS rates were not "just and reasonable" under Alaska's Pipeline Act.[3] RCA rejected the settlement-generated rate-making methodology, and prospectively substituted a "depreciated original cost" ("DOC") methodology. RCA determined values for constituent components of the DOC formula, calculated rates substantially lower than those filed by the Carriers, and ordered refunds to the shippers. The TAPS Carriers and the State of Alaska appeal this decision to the Superior Court pursuant to Alaska Rule of Appellate Procedure 602(a)(2).[4]

Planning for TAPS began in 1967. Oil first flowed in 1977. The Federal Energy Regulatory Commission ("FERC") regulates most of the oil "throughput" as interstate commerce. Somewhat less than ten percent is delivered to refineries near Fairbanks and Valdez or shipped to Nikiski. RCA regulates only this intrastate component.

Precursor rate litigation commenced post-construction of TAPS in 1977. After eight years of expensive and burdensome parallel proceedings before FERC and RCA's predecessor agency the Alaska Public Utilities Commission ("APUC"), the State of Alaska and the TAPS Carriers settled both the interstate and intrastate dockets in 1985. Thereafter the TAPS Carriers have calculated intrastate rates pursuant to their dickered deal, known as the TAPS Settlement Methodology ("TSM"). TSM is a highly customized ratemaking methodology which deviates significantly from traditional ratemaking methodologies used by RCA and its predecessors, APUC and the Alaska Pipeline Commission.

---

* The superior court's Decision and Order has been edited to conform to our style and formatting requirements and most internal citations have been omitted.

1. The eight original owners were subsidiaries of Amerada Hess, ARCO, BP, Exxon, Mobil, Sohio, Phillips and Union. Mergers and transfers have reduced their number to five. They are BP Pipelines (Alaska), Inc.; ExxonMobil Pipeline Company; Phillips Transportation Alaska, Inc.; Unocal Pipeline Company; and Williams Alaska Pipeline Company, L.L.C.

2. The same order is also styled Order No. 110 in related Docket P–97–7 (collectively, "Order No. 151").

3. AS 42.06.140 and .410(a).

4. The statutory basis for jurisdiction is found in AS 22.10.020(d), AS 42.06.480(a), and AS 44.62.560–.570.

The TAPS Carriers submitted their settlement for approval by APUC on May 30, 1986. Petro Star Inc., a Fairbanks refiner, protested and thereby prolonged proceedings until it in turn settled with the Carriers in 1993. APUC granted final approval to the TAPS settlement with the following relief-tinged words:

> [e]ntities impacted by oil pipeline rates are sophisticated and capable financially and practically of protecting their own interests. Not one has come forward to contest the TAPS Settlement. Under these circumstances, the public interest does not require that this proceeding be continued.[5]

Thus APUC entered no findings on the merits regarding the initial rate litigation commenced in 1977 and ultimately terminated in 1993. But APUC left open the door for the instant rate litigation:

> Each new rate filed by the TAPS Carriers under the Intrastate Settlement Agreement is considered to be a revised tariff filing ... subject to the same standards and procedures to which it would have been subject if the Intrastate Settlement Agreement had not been accepted.[6]

The procedural history of the TAPS rate litigations is set forth at Endnote 2 of Order No. 151. On December 23, 1996, Tesoro protested the 1997 filed rates; Mapco, predecessor of Williams Alaska Petroleum Inc., subsequently intervened. The APUC opened Docket 97–4 to determine if post-1996 rates were just and reasonable under AS 42.06.370. The Carriers filed their case-in-chief on October 8, 1998, focusing on whether TSM should continue to govern intrastate rates. On March 15, 1999, Tesoro filed a motion for summary judgment alleging a failure of proof that 1997–98 TSM-based intrastate rates were just and reasonable. RCA granted the motion on April 10, 2000, reasoning that the Carriers' focus on the validity of TSM over the TAPS' lifetime must yield to a focus on the specific years in question. RCA calendared additional proceedings for the Carriers to prove their 1997–2000 rates just and reasonable, in light of RCA's summary judgment findings.

The Carriers filed their second-round direct testimony on July 12, 2000. Their central point, elaborated in a "benchmark" economic model, was that if a standard DOC methodology, employing standard straight-line depreciation rather than TSM accelerated depreciation, had been employed *ab initio*, consistently calculated 1997–2000 rates would be higher than those actually filed by the Carriers under TSM. A five-week hearing ensued beginning April 2001.

RCA promulgated Order No. 151 on November 27, 2002, decreeing *inter alia* that the Carriers' intrastate rates for 1997–2000 were excessive and that historically recovered accelerated depreciation, rather than a deemed straight-line depreciation, governed calculation of the Carriers' year-end 1996 unrecovered investment ("rate base"). RCA calculated the rate base to be $669 million rather than the $3.2 billion computed by the Carriers. RCA also ruled upon various disputes as to component factors of the traditional ratemaking formula such as the appropriate treatment of risk factors, rates of return, and the amount of presumed equity and debt which financed construction of the pipeline. RCA parenthetically found that under the TSM regime up to 1998, the Carriers potentially garnered a $9.9 billion windfall through excessive rates. RCA made no attempt to recapture any such windfall because the regulatory proscription against "retroactive ratemaking" prevents redress for past year under- or over-collections. Using its traditional DOC methodology and data inputs derived from the record, RCA established rates for the disputed period.

The Carriers appealed from Order No. 151 on December 6, 2002. Later, RCA issued Order No. 159, rejecting applications by several Carriers for individualized rates for 1997–2000. Finally, RCA issued Order No. 162 establishing a 10.5% interest rate on refunds. The Carriers appealed from that

---

**5.** *Re Amerada Hess Pipeline Corp.*, 13 APUC 448, 456 (1993).

**6.** *Id.*

order on June 3, 2003. The instant proceeding consolidates appeals of those three orders. The State of Alaska joins the appeal on two issues only, RCA's computation of pre–1997 depreciation and its refusal to set individual Carrier rates. RCA intervened to defend its orders.

The TAPS Carriers, but not the State of Alaska, challenge Order No. 151 on procedural due process grounds over RCA's denial of a motion to recuse staff economist Antony Scott. RCA is authorized by statute to hire "engineers, examiners, administrative law judges, arbitrators, mediators, experts, clerks, accountants, and other agents and assistants." [7] In 1999, the Alaska Legislature appropriated funds for a staff economist. RCA commissioner Nanette Thompson hired Mr. Scott, a doctoral candidate in economics at the University of Wisconsin Madison. He began his work at RCA in July 2000, several months after RCA's grant of summary judgment to Tesoro to the effect that the Carriers had failed to prove that their filed rates were just and reasonable, and prior to the Carriers' second case-in-chief.

Upon learning of Mr. Scott's appointment, the Carriers timely moved on March 12, 2001 for his recusal. At the University of Wisconsin in 1996, Mr. Scott had submitted a master's thesis entitled "The Trans Alaska Pipeline System: The Consequences and Causes of Regulatory Failure." Mr. Scott argued that aspects of the TSM engendered a windfall for the Carriers because TSM was inadequately tied to costs. Protracted adversary rate proceedings, caused in part by the FERC's reluctance to regulate decisively, gave the Carriers a bargaining advantage. The State of Alaska probably ceded too much at the bargaining table.

Mr. Scott was acquainted with Mr. Richard Fineberg, an economist who also criticized the TAPS settlement. At the time Mr. Scott was hired by RCA, Mr. Fineberg was hired by RCA's Public Advocacy Section, which operated separately from the commissioners and their advisory staff pursuant to AS 42.04.150. Fineberg subsequently testified in the proceedings below.

Mr. Scott avers that he read several articles authored by Mr. Fineberg as he researched his master's thesis. Pre-hiring, Scott engaged in telephone and e-mail contacts with Fineberg, who paid Scott $150 for brief research. In April 2000, Fineberg e-mailed Scott that he had been retained by the Public Advocacy Section to work on the case and that "he had tried but failed to bring [Mr. Scott] in on the case." Mr. Scott responded that he had been hired to work as advisory staff; Fineberg sent a congratulatory note. At RCA Scott briefly met Fineberg. Scott denied that they discussed any aspect of his thesis, Fineberg's articles or the case at hand.

RCA denied the recusal motion, citing AS 42.04.050's authority to hire staff with technical expertise. It distinguished cases cited by the Carriers regarding bias on the part of administrative decisionmakers because Mr. Scott was not one. It analogized Mr. Scott to a "specialized law clerk," and stated:

[W]e must determine whether the highly complex TAPS Settlement Methodology (TSM) results in just and reasonable rates. The assignment we have given Scott is not to investigate independently, or to be an advocate or a witness. Scott is one among a team of advisors, including our administrative law judges, and expert professional financial and engineering staff, who assist us in carrying out our duties. We rely upon our team of advisors to help us understand and evaluate the extensive and highly technical testimony offered by all parties.

Because of his expertise as an economist, Antony Scott is very valuable to us. We cannot readily substitute another advisor, both because of funding limits and because we believe, based on the lengthy process required to hire him, that similarly qualified economists are not easily found.

. . . .

In this case we have taken some extraordinary measures to assure that our decisionmaking process is not unduly influenced by

7. AS 42.04.050.

any assertions outside the record or by any theories that Scott may have developed in the past on issues relevant to these proceedings. Upon notice of the TAPS Carriers' objections to Scott's work as our advisor, we inquired in detail about Scott's contacts with Fineberg. We explored with Scott the extent to which he is able to segregate and identify for us any philosophical leanings or opinions he may have about the subject matter of this case. Our discussions included his ability to act in a fair and impartial manner to help us understand the technical testimony and opinions of all witnesses in this case.

## II. STANDARD OF REVIEW

■ In this consolidated appeal from administrative decisions, the superior court directly scrutinizes the merits of those decisions. The court reviews RCA's factual findings under a "substantial evidence" standard; they should be upheld if supported by relevant evidence that a reasonable person might accept as adequate to support them.[8]

■ As to questions of law not implicating RCA's special expertise, this court substitutes its own judgment. If RCA employs specialized expertise in a legal determination, the court applies a rational basis standard; RCA's interpretation prevails over the court's, so long as RCA is reasonable.[9]

■ The deferential "reasonable basis" standard also applies to fundamental policy decisions.[10] But a failure to consider an important factor can undermine the reasonableness of a policy decision.[11] Also, an unexplained failure to follow agency precedent can erode the deference due a policy decision.[12]

## III. DISCUSSION

### a. Failure To Recuse

The TAPS Carriers complain that RCA's refusal to recuse staff economist Scott denied them a fair and impartial hearing, in violation of the due process clauses of both the United States and Alaska Constitutions.[13] Their briefing intertwines citations to federal and Alaska cases. It is useful to first survey federal law.

Professor Richard Pierce, Jr., successor author of the oft-cited Kenneth Culp Davis *Administrative Law Treatise*, provides an apt introductory summary to the federal law of neutral decision makers:

The concept of "bias" has at least five meanings. Although the five kinds of bias shade into each other, the main ideas about bias in an adjudication may be stated in five sentences, each of which deals with one kind of bias: (1) A prejudgment or point of view about a question of law or policy, even if so tenaciously held as to suggest a closed mind, is not, without more, a disqualification. (2) Similarly, a prejudgment about legislative facts that help answer a question of law or policy is not, without more, a disqualification. (3) Advance knowledge of adjudicative facts that are in issue is not alone a disqualification for finding those facts, but a prior commitment may be. (4) A personal bias or personal prejudice, that is an attitude toward a person, as distinguished from an attitude about an issue, is a disqualification when it is strong enough and when the bias has an unofficial source; such partiality may be either animosity or favoritism. (5) One who stands to gain or lose by a decision either way has an interest that may disqualify if the gain or loss to the decisionmaker flows fairly directly from her decision.

---

8. *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1231 (Alaska 2003).

9. *Id.*

10. *Id.*

11. *Ninilchik Traditional Council v. Noah*, 928 P.2d 1206, 1217 (Alaska 1996).

12. *Totemoff v. State*, 905 P.2d 954, 967–68 (Alaska 1995).

13. U.S. Const. amends. V, XIV; Alaska Const. art. I, § 7.

The heart of each of the five propositions is supported by clear and noncontroversial law and by prevailing opinion, except that the first two propositions are commonly misunderstood, especially the effect of a closed mind on issues of law or policy or issues of legislative fact. With that one exception, the problems about the law of bias do not relate to the soundness of the five propositions but relate to their application and to the clear demarcation of each from the others.[14]

The TAPS Carriers allege that prejudgment of adjudicative facts by a staff member creates an appearance of bias on the part of the three decisionmaker commissioners. They argue that RCA's decision should be vacated pursuant to *Cinderella Career & Finishing Schools, Inc. v. FTC*[15] if "a disinterested observer may conclude that [the agency] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." The Carriers concede that if Mr. Scott's master's thesis merely amounts to a prejudgment or point of view regarding questions of law or policy ("legislative facts"), due process is not offended. They contend that the thesis instead involves case-specific or adjudicative facts. The Carriers recognize that Mr. Scott was not a decision maker, but argue that staff bias suffices to taint the entire process.

Appellees Tesoro and RCA argue *inter alia* that the standard for disqualification is not the "prejudgment in some measure" test applicable to adjudicative facts, but rather an "irrevocably closed mind" test which applies to agency prejudgments of legislative facts.[16] They believe Mr. Scott's thesis is best characterized as policy-oriented analysis rather than as a finding of contested facts. They emphasize that Mr. Scott was a mere staffer,

and not a decision maker, so his biases could not disqualify the three RCA commissioners.

The test proposed by the TAPS Carriers derives from *Cinderella Career & Finishing Schools*. During a speech to a press association the chairman of the Federal Trade Commission briefly criticized a charm school for implying that its curriculum opened doors to airline hostess jobs. The charm school's administrative appeal was then pending before the chairman. The *Cinderella* court concluded that his public remarks created an appearance that he had prejudged the case such that it would proceed "in predestined grooves." [17] In the light of prior warnings to him in other cases, the court scarcely concealed its disgust for his ethical laxity. *Cinderella* most squarely stands for the proposition that intemperate public remarks by a decision maker create a constitutionally impermissible appearance of outcome-determinative prejudgment.

As framed by the parties, the issue for decision is whether prejudgment of issues by a staffer in an unpublished master's thesis at a Midwestern university in 1996, triggers the *Cinderella* standard of "prejudgment in some measure" or the far more deferential "irrevocably closed decision maker mind" standard.[18] Unlike *Cinderella*, the case at bar is not a public-foot-in-mouth case. Even if fact-finding intrudes into the more predominant analytical drift of Scott's thesis, the aspect of public intemperance so central to *Cinderella* is lacking.

In *Withrow v. Larkin*,[19] a state agency investigated a doctor's practices, issued a disciplinary complaint, and then adjudicated the matter. The physician complained that this commingling of investigatory and adjudicative functions violated procedural due process. The U.S. Supreme Court squarely rebuffed the argument that agency investi-

**14.** 2 Richard Pierce, Jr., Administrative Law Treatise § 9.8, at 648–49 (4th ed.2002).

**15.** 425 F.2d 583, 591 (D.C.Cir.1970).

**16.** *FTC v. Cement Inst.*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948).

**17.** *Cinderella Career & Finishing Sch.*, 425 F.2d at 590.

**18.** *FTC v. Cement Inst.*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). The phrase "irrevocably closed decision maker mind" is this court's, not the *Cement Institute* Court's.

**19.** 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

gations into adjudicatory facts taint subsequent proceedings. The Court noted initially:

> [V]arious situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable. Among these cases are those in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him.

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weaknesses, conferring investigative and adjudicative powers on the same individuals poses *such a risk of actual bias or prejudgment* that the practice must be forbidden if the guarantee of due process is to be adequately implemented.[20]

The *Withrow* Court did not mention the D.C. Circuit's *Cinderella* "prejudgment in some measure" standard, announced five years earlier. Rather, the *Withrow* Court revisited the Court's 1948 decision in *FTC v. Cement Institute*.[21] In *Cement Institute* the Federal Trade Commission had investigated and reported in writing to Congress on the legality of an industry-wide pricing mechanism. The *Cement Institute* Court assumed *arguendo* that the FTC had formed a prejudgment opinion of illegality, but found that this did not suggest the commissioners' minds were "irrevocably closed" to testimony, cross-examination, and argument. The *Withrow* Court concluded:

The mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the board members at a later adversary hearing. Without a showing to the contrary, state administrators "are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." [22]

Under *Withrow*, RCA could have retained an economist to conduct an *ex parte* investigation of the TAPS rate structure. His findings, indistinguishable from Mr. Scott's thesis, would not disqualify the commissioners. It is therefore difficult to conclude that Scott's employment *per se* offends federal due process.

In *NEC Corp. v. United States*,[23] the Federal Circuit explicitly rejected the "prejudgment in some measure" test as unduly abstract and impractical, adopting the "irrevocably closed mind" formulation. In *Starr v. Federal Aviation Administration*,[24] the Seventh Circuit addressed an issue of staff prejudgment. The FAA's Federal Air Surgeon wrote a position paper opposing case-by-case exemptions to the FAA's mandatory retirement rule for airline captains. Captain Starr sought an exemption, moving to recuse the non-decisionmaker Air Surgeon pursuant to *Cinderella*. The Court applied a presumption of good faith and affirmed the FAA's refusal to recuse.

The TAPS Carriers assert that the *Cinderella* test applies to all prejudgment-of-adjudicative-fact cases and that the much less stringent "irrevocably closed mind" test only applies to legislative facts or policy matters. But the Ninth Circuit has rejected any

> rigid, artificial distinction between rulemaking and adjudication.... This is particularly true when the functions of the agency are varied and comprehensive. Due process should not depend upon this distinction but rather upon a specific and practical inquiry into the decision making

---

**20.** *Id.* at 47, 95 S.Ct. at 1464 (emphasis supplied).

**21.** 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948).

**22.** *Withrow*, 421 U.S. at 55, 95 S.Ct. at 1468.

**23.** 151 F.3d 1361 (Fed.Cir.1998).

**24.** 589 F.2d 307 (7th Cir.1979).

tasks of the Board and a factual analysis of how the challenged feature could render its decision making process unfair.[25]

In general, most federal decisions reviewing agency bias allegations apply a presumption of regulatory propriety at odds with the vague "prejudgment in some measure" test. Federal cases like *Cinderella* can best be viewed as responses to egregious official obnoxiousness which gratuitously undermines public trust, rather than as across-the-board standards for all agency prejudgments of arguably adjudicative facts.

Although the RCA commissioners sought the assistance of an economist to manage voluminous technical testimony, they were not novices in the regulatory field. They heard extensive expert testimony on all issues. The court has not been cited to facts suggesting a practical likelihood that the commissioners were in any sense dominated by the opinions of their staff economist. There is no evidence that any commissioner prejudged any aspect of this case. There was no public impropriety by any commissioner or staffer.

RCA was aware of Scott's thesis and the Carriers' concerns. RCA obtained assurances from him that he would not overstep the bounds of a loyal staffer in an explanatory and advisory role. There is scant likelihood that the commissioners were psychologically or intellectually dominated by their staff member such that the presumption of honest judgment is rebutted. This situation does not approach that zone of egregiousness where federal courts discern a procedural due process violation based on prejudgment bias relegating adjudication to "predestined grooves." [26]

Alaska administrative due process decisions tend to survey both federal and foreign state law. The Court in *Amerada Hess Pipeline Corp. v. Alaska Public Utilities Commission*[27] did so in its discussion of the due process implications of commingled investigative and adjudicative agency action. Citing *Withrow*, the court adopted the federal rule allowing adjudicating agencies to first conduct *ex parte* investigations: "We see no reason to provide broader due process protection under the Alaska Constitution in this instance." [28]

The TAPS Carriers urge that the unusual fact of Scott's on-point graduate thesis creates an appearance of agency prejudgment that should offend Alaska due process. They characterize the thesis as instinct with fact-finding. But graduate student Scott did not decide whether the butler killed the cook with a candlestick in the library. Rather, he took publicly available data regarding pipeline costs, revenues, taxes, capital structures, and rates of return, plugged them into a standard ratemaking methodology, and concluded that TSM-generated revenues exceeded the standard regulatory paradigm. His thesis was primarily an exercise in analysis, not fact-finding. It is likely that many economists familiar with traditional ratemaking principles would opine that TSM was idiosyncratic and yielded higher-than-normal initial rates. Others might disagree. That Mr. Scott was not a *tabula rasa* should not *per se* disqualify him from service. Nothing in the record suggests that this exhaustive ratemaking adjudication was in any sense intellectually dishonest because of Scott's involvement.

The TAPS Carriers cite two Alaska cases for the proposition that Mr. Scott's participation offended Alaska's due process clause. *In re Robson* involves the Alaska Bar Association's disciplinary action against lawyer Robson.[29] The Court found that the Bar Association's executive director was part of the prosecution team. She was present while the Disciplinary Board deliberated upon and decided Robson's fate. The court held that her presence violated due process because both the appearance and the fact of impartiality required that neither prosecution

---

**25.** *United Farm Workers of Am., AFL–CIO v. Arizona Agric. Employment Relations Bd.*, 727 F.2d 1475 (9th Cir.1984) (citation omitted).

**26.** *Cinderella*, 425 F.2d at 590.

**27.** 711 P.2d 1170 (Alaska 1986).

**28.** *Id.* at 1180.

**29.** 575 P.2d 771 (Alaska 1978).

nor defense counsel intrude into the functional equivalent of a jury deliberation.

The TAPS Carriers argue that *Robson* stands for the broad proposition that "participation by manifestly biased persons in advisory positions violates due process." But *Robson* stands more narrowly for the self-evident proposition that all advocates, the prosecution and defense alike, are *per se* excluded from the jury room or its functional equivalent. The case adds little to the analysis of the readily distinguishable facts of this case; Mr. Scott never intruded into anything akin to a jury deliberation.

The TAPS Carriers also rely upon *Vaska v. State.*[30] There, a judge's law clerk provided the district attorney's office with a confidential bench memorandum accompanied by a yellow sticky notation indicating that she was advocating for the D.A. sub rosa. She was "an active partisan who was willing to break the rules to benefit the state ... with a bias above and beyond philosophical or political bias in favor of the government in criminal cases."[31] The Court of Appeals held that if she participated to a significant degree in judicial rulings in the case, those rulings should be re-examined by another judge.

When she purloined the bench memo and composed the yellow sticky, the *Vaska* law clerk forfeited her presumption of honesty and fair dealing. She became a volunteer prosecution mole. Like the *Robson* prosecutor, she was a fox-in-the-chicken coop. Both *Robson* and *Vaska* involve staffers overstepping well recognized, bright-line boundaries.

In contrast, Mr. Scott did nothing wrong. He authored a scholarly thesis in graduate school. Some years later he landed a job advising a recondite state agency. Whether the job and the thesis are incompatible is a fair question. But resolution of the matter turns on the mainstream constitutional and administrative law analyses in the federal cases cited above, and not on any punctilio of Alaska law analogized from a jury room trespass or a rogue law clerk.

As in *Amerada Hess,* the Alaska Supreme Court will likely look to federal law to decide the TAPS Carriers' due process challenge and will not perceive it appropriate to adopt a more expansive interpretation of Alaska's due process clause. Under either law, the unrebutted presumption of honesty coupled with the absence of practical indicia that the wills of three fair-minded men and women were overborne by their "specialized law clerk" defeats the claim that Mr. Scott's authorship of an on-point master's thesis disqualifies him from staff service as a matter of constitutional law.

### b. Alleged Departure from Rate–Base Precedent

Order No. 151 holds that a "[depreciated original cost] methodology applied from the beginning of pipeline operations should be used in this case to determine rates." The Carriers explain the DOC methodology in an appendix to their opening brief. DOC is expressed by the formula $R = Br + T + D + O$. R stands for revenue requirement, the annually recomputed dollar amount the Carriers are permitted to collect through their per-barrel tariff. B stands for rate base, which is the historical capital investment to construct, upgrade or augment the asset. Rate-making permits the owner companies to recover this investment over the life of the pipeline; thus the rate base declines annually. The portion of investment to be recovered in any given year is termed "depreciation." It is to be distinguished from the more theoretical allowance for diminishment by aging used in financial accounting and tax law.

Rate of return ("r") is the percentage that the owners are permitted to earn on the constantly diminishing rate base. It is derived from a weighted average of the cost of equity dollars and borrowed dollars invested in the pipeline. The percentage mix of debt and equity dollars is termed the "capital structure." The cost of debt is the applicable interest rate; the cost of equity is the rate of return to the Carriers allowed by RCA to compensate them for their investment of cap-

---

**30.** 955 P.2d 943, 946–47 (Alaska App.1998).

**31.** *Id.*

ital. Both costs may be adjusted to compensate for higher than normal risk factors in the construction or operation of the pipeline. The ratio of equity and debt used in ratemaking may be derived from book values, or may, as here, be a hypothetical ratio deemed appropriate by the ratemaking authority. Since the return on equity is higher than the return on debt, carriers typically advocate more equity, and shippers more debt, in a deemed capital structure.

The Income Tax Allowance ("T") is added to permit the owners their full after-tax earnings on the equity portion of the capital structure. Operating Expense ("O") allows annual recovery of the gamut of operating expenses including salaries and wages, maintenance costs, and insurance.

The DOC method uses straight-line depreciation, permitting Carriers to recover equal amounts of their investments over the years of the pipeline's life. Alternatively, recovery of capital can be "front-loaded" in the early years of a pipeline's life by applying an accelerated depreciation schedule. Tesoro and Williams argued, and RCA found in Order No. 151, that the TSM rates for all years prior to 1997 were based on accelerated, rather than straight-line, depreciation, and that pre-TSM rates effectively included accelerated depreciation. Order No. 151 calculated the 1996 year-end rate base by applying this accelerated depreciation to the initial post-construction 1977 rate base and to each succeeding annual rate base through 1996. RCA determined the 1996 year-end rate base to be $669 million. From 1997 forward this rate base would be depreciated on a straight-line basis.

The Carriers deny that pre–1997 rates were based on accelerated depreciation. They argue that TSM should be disregarded, and that RCA should simply apply straight-line depreciation from the beginning of the life of the pipeline through 1996, regardless of the depreciation actually collected. Their calculation yields a $3.2 billion rate base for year-end 1996. Order No. 151 implicitly finds that all but $669 million of the Carriers' claimed $3.2 billion rate base had already been recovered; adopting the Carriers' numbers would entail a double recovery of $2.53 billion. This divergence over the correct depreciation and ensuing rate base dwarfs all other methodological disputes in this appeal.

■ The Carriers and the State allege that RCA departed from agency precedent by employing accelerated rather than straight-line depreciation to establish the year-end 1996 rate base. Two rate cases adjudicated by RCA predecessors have calculated a new rate base midstream in the life of a pipeline. In *Cook Inlet Pipe Line* an initial intrastate rate case was commenced thirteen years into the life of the affected pipeline.[32] The APUC rejected a "valuation methodology" employed by the Interstate Commerce Commission for interstate rates, and instead chose to impose its standard DOC methodology with straight-line depreciation. APUC similarly applied DOC in *Kenai Pipe Line Co.*[33] APUC could not discern from the existing record the basis for the prior intrastate rate, and so adopted straight-line depreciation.

The Carriers argue that both cases stand for the proposition that, in midstream rate cases, DOC's straight-line depreciation must be applied from a pipeline's inception to establish the midstream rate base, without consideration of any accelerated depreciation actually collected. Since the only two decided cases proceeded in this fashion, the Carriers perceive an irrational rejection of precedent in RCA's present recognition of historical accelerated depreciation for the TAPS midstream rate-base calculation.

It is useful to cite at some length relevant discussion in Order No. 151:

When the APUC established a DOC rate base in the middle of the life of the *Cook Inlet* line, it used actual straight-line charges included under the ICC valuation methodology to calculate the new DOC rate base. Therefore, rather than providing precedent for use of straight-line depreciation when establishing a rate base in

**32.** 6 APUC 527 (1985).

**33.** 12 APUC 425 (1992).

the middle of the life of the line, *Cook Inlet* more precisely stands for the proposition that the actual depreciation charges should be used for calculating future rates.

In *Kenai*, the APUC could not determine which methodology the Kenai Pipe Line Company (KPL) had used to calculate prior intrastate rates. The APUC presumed the prior intrastate rates were calculated under the ICC valuation methodology and under those facts, the APUC concluded that the same straight-line depreciation that was included or was includable in rates computed under the ICC valuation methodology should be used in calculating the new rates.

The APUC ordered the use of straight-line depreciation in *Kenai* and *Cook Inlet* because straight-line depreciation was the depreciation actually used to calculate prior rates. *Kenai* and *Cook Inlet*, therefore, stand for the proposition that when establishing a DOC rate base for an existing pipeline in the middle of the operating life we should apply the depreciation actually used to establish prior rates rather than the depreciation that would or should have been used. Therefore, the Carriers' citations to *Cook Inlet* and *Kenai* as precedent for using straight-line depreciation in this case to calculate a DOC rate base are not persuasive. Instead, *Cook Inlet* and *Kenai* support using [accelerated] TSM depreciation charges to calculate a mid-stream rate base because that depreciation schedule was used to establish the past rates charged to shippers.

The Carriers argue that RCA misinterprets *Cook Inlet* and *Kenai*. But as to *Kenai*, the agency cited a cold and indeterminate record, found it reasonable to assume the ICC's valuation methodology had in fact been used in the past, and thereupon plugged ICC straight-line depreciation into its DOC formula. If depreciation had been determined by throwing darts, the regulators would have recognized past use of "randomized dart" depreciation, as RCA reads the decision. This court has no basis to disagree with RCA's seemingly reasonable interpreta-

tion of *Kenai*; RCA is entitled to deference based on agency expertise in interpreting the rate-making decisions of predecessor regulatory entities.

Even if RCA could be shown to have misread these cases, it is free to fashion an improved procedure for midstream rate-base determinations as long as such is not unreasonable and arbitrary.[34] RCA reasonably finds that it would be poor public policy to allow the Carriers to double collect $2.5 billion of their investment. An avoidance of any double recovery accords with lay notions of fairness and common sense; this court would support RCA in overruling *Cook Inlet* and *Kenai* if in fact they mandated a double recovery. RCA has not been shown to be unreasonable or arbitrary in rejecting an outcome that reasonable regulators could find indefensible.

### c. Depreciation Component of Prior Rates

The Carriers argue that RCA's conclusion, that accelerated TSM depreciation rather than straight-line depreciation was actually collected in the pre–1997 rates, has no reasonable basis in the record. The Carriers note that their initially filed rates took effect in July 1977, well before the advent of TSM. The Carriers argue that the record "clearly and indisputably" establishes that straight-line depreciation was used prior to the 1985 TAPS settlement because, in 1982, the parties to the initial rate litigation stipulated to prospective interlocutory use of straight-line depreciation.

The Carriers contend that the 1982 stipulation remained in force post-settlement. Further, TSM should not be viewed as establishing any individual component of past rates, because it "merely set agreed-upon ceilings above which the TAPS Carriers could not file tariffs, and at or below which the State could not protest the TAPS Carriers' rates." The Carriers view TSM depreciation as a component of an indivisible settlement. While the State and the Carriers compromised on sundry ratemaking components to arrive at a mutually satisfactory package deal, they argue, neither would necessarily have agreed

---

**34.** *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1231 (Alaska 2003).

to TSM depreciation in isolation from other dickered items which rendered the whole acceptable. Thus the Carriers suggest it is unfair to select TSM depreciation as the sole enduring feature of TSM by deeming it actually-collected depreciation.

### 1. Pre-settlement Depreciation

RCA found the depreciation stipulation to be, for all practical purposes, irrelevant, because it was superseded by the TAPS settlement. Order No. 151 reads:

> The Carriers have urged that using TSM depreciation charges to set rate base for 1997–2000 is inappropriate, because TSM itself contained no depreciation charges for 1977–1983. Instead, the Settlement Agreement set a starting rate base for 1983 year-end and determined depreciation charges for 1984 through the present. The depreciation charges upon which Tesoro relies are contained in an illustrative exhibit [in support of APUC approval of the 1985 TAPS settlement] known as TSM–6.

> We acknowledge that the TSM–6 depreciation charges were not directly used to set tariffed rates for 1977–1983. Rather, until the Settlement was brokered, rates were still being charged according to the originally filed and suspended rates from 1977.... [T]he record shows that the Carriers and the APUC relied on the TSM–6 depreciation charges to arrive at and accept the Settlement's starting rate base.... [A]s a witness for Williams noted, the depreciation contained in TSM–6 was "analogous to setting a rate based on a suspension rate. In other words, the Carriers had made a tentative filing under one rate methodology, and the actual depreciation rates to be used were not established until later."

Thus RCA found that TSM was retroactively applied from the pipeline's inception. Tesoro argues that the initial provisional tariffs were excessive and would have engendered refund obligations in the billions if TSM had not retroactively reckoned them to include accelerated depreciation.

 RCA's finding that pre-settlement depreciation charges were consistent with accelerated depreciation is most specifically supported in the record by the testimony of State's witness Jerome Haas. Mr. Haas was a member of the State's settlement team who participated in the creation of TSM; he testified as both an expert and an occurrence witness. Haas stated that a core settlement goal of the State was to set rates that would decline over time to match declining throughput. Asked how TSM achieved these declining rates, he explained:

> Primarily, the steeply declining rate profile was achieved by rapidly depreciating the original, pre-operating TAPS investment over the years 1977–84, i.e. the operational years preceding the settlement.... *Applied retrospectively [at the time of settlement] in 1985, the front-loaded depreciation resulted in presettlement rates that were roughly equal to the rates the owners actually collected under their filed tariffs.* The State believed those past rates were excessive when judged against a benchmark based on traditional straight-line depreciation schedules, but it was willing to accept them as part of a settlement package that produced reasonable and low tariff rates for 1990 and beyond.... The resulting, accelerated depreciation schedule was one of the most attractive benefits to the State of the TAPS Settlement Methodology.... All parties clearly understood that the effect of using the rapid depreciation I have described would be the relatively quick recovery of invested capital.... At the time of the settlements, it was expected that four-fifths of the original (pre-operational) TAPS investment would be recovered by 1990, even though the system would have operated by then for only about two-fifths of its expected economic life.

This quoted passage substantially supports RCA's conclusion regarding presettlement depreciation. This court may not weigh or balance conflicting testimony of adverse experts; it is merely to ascertain whether RCA had a reasonable basis in the record for determining that the rates filed before settlement included, *de facto,* accelerated depreciation. The court so finds.

## 2. Significance of TSM Depreciation

The parties do not seriously dispute that TSM employs accelerated depreciation. For example, Carrier expert Adam Jaffe testified that TSM specified a rate base recovery schedule that is much more rapid than the normal ratemaking schedule. Carrier expert Billy Folmar testified that TSM depreciation is unique because it is "front-end loaded."

Tesoro argued, and RCA found, that the computation of accumulated depreciation from 1977 through 1996 should be based on the actual depreciation recovered in prior rates. The Carriers argue that TSM did not establish this datum, but merely set a rate ceiling; an individual Carrier was free to charge any rate it chose, concocted under any methodology, so long as the rate fell at or below the ceiling. But the Carriers cite no evidence to this court of discounted rates. The theoretical possibility of below-ceiling rates does not establish the counterintuitive scenario that Carriers, authorized to recover accelerated depreciation, failed to do so. In fact, Carrier witness Billy Folmar testified that no Carrier had voluntarily reduced a tariff below the TSM ceiling:

Q: Now if BP Pipeline had ever voluntarily reduced a tariff below the maximum rate it would be shown on line 135 [of its calculation of TSM for the year 2000], wouldn't it?

A: That is correct.

Q: Are you aware of any carrier prior to 1996 who had a voluntary revenue reduction?

A: I'm not aware of one.

Q: You went through every individual carrier's form ... and you don't remember any voluntary reductions prior to 1996?

A: I don't recall that there were any.

Absent proof of discounted tariffs, to characterize TSM as a mere ceiling rate is to quibble. Since the Carriers cite no record evidence of voluntary reductions, their "mere ceiling" argument fails to undercut RCA's conclusion that TSM depreciation equates with depreciation actually recovered.

When the TAPS settlement was presented to the Federal Energy Regulatory Commission for approval, the State in an Explanatory Statement represented that accelerated depreciation would actually be included in charged rates:

The TSM employs a unit of throughput depreciation schedule which, through negotiations, was accelerated in order to meet the [State's] objective of ensuring a declining tariff profile.... The [State's] objective ... required that a large fraction of the original investment be depreciated in the early years of the TAPS. Consequently, the rate base—the amount upon which the owners earn their rate of return—shrinks rapidly. For example, by 1990 the depreciated cost arising from pre-operational investments in TAPS would be approximately one-fifth of its initial 1977 historic cost, even though about two-thirds of the system's economic life still remains.

The Explanatory Statement further noted that, by 1990, the heavy hand of accelerated depreciation would so dramatically diminish the rate base that the Carriers might lack incentive to continue pipeline service. Therefore TSM would discard the insignificant remaining rate base in 1990 in favor of a more lucrative per-barrel allowance to keep the Carriers in active play.

RCA simply had no hard evidence on which it could conclude that the TAPS Carriers acted inconsistently with the provisos of the State's Explanatory Statement, forgoing front-loaded depreciation. The evidence rather consistently tends to refute such a counterintuitive outcome. Tesoro quotes a telling 1989 BP Pipeline memorandum explaining away allegations of excess profits from 1983–1987:

[The] ratemaking agreement ... front loads the recovery of investment.... [T]hus *the TSM depreciation allowance ... embedded in the revenues for the period* is materially greater than that reflected on the financial records of the carriers.... [W]hile there is certainly substantial cash generation during the period, it reflects primarily the accelerated recovery of investment, not profit.

The author, writing to rebut an inference of windfall profits, supports RCA's conclusion that TSM depreciation was actually "embedded" in the rates collected by the Carriers.

The Carriers contend that the 1982 interlocutory straight-line depreciation stipulation remained in force post-TAPS settlement. The State argues more narrowly that "in the absence of a settlement agreement, this stipulation would have governed the depreciation schedule." The shippers' position, accords with the testimony of Williams' expert Kenneth Johnston: "I view the TSM undertaking as one that supersedes this stipulation with respect to rate and tariff matters." This court finds that RCA had before it sufficient evidence to justify a reasoned conclusion that TSM superseded the 1982 depreciation stipulation.

Finally, the Carriers and the State contend that no single aspect of the settlement should be considered in isolation from all other elements. Doing so might give the shippers the benefit of one provision of the settlement, without recognition of balancing tradeoffs regarding other features. Neither the Carriers nor the State complain about a full historical review of economic statistics to derive actual annual inputs for the rate formula; but both contend that TSM's status as a negotiated settlement component *ipso facto* insulates it from inclusion in a historical rate-base computation.

The Carriers offered no concrete evidence that TSM depreciation charges should have been equitably reallocated to other components of TSM. The court has not been cited to evidence that the interests of the carriers were either advantaged or disserved by accelerated depreciation, or that it in fact represented a tradeoff. Absent actual proof establishing why TSM depreciation could or should not survive apart from its settlement context, RCA was not required to discount record evidence that such depreciation was embedded in prior rates.

This court holds that RCA had a reasonable basis to conclude that the rates from 1977 through 1982, filed by the Carriers but never approved on their merits by the Alaska Public Utilities Commission, were sufficiently robust to be deemed inclusive of accelerated depreciation; that the initial rate base and the 1983–85 rates were retroactively established under TSM in accord with its accelerated precept; that the 1982 depreciation stipulation was superseded by the TAPS settlement and had no effect on the initial rate base and subsequent rates; that accelerated depreciation was embedded in all post-settlement rates, and was properly used to derive the year-end 1996 rate base; and that an artificial reversion to a deemed straight-line depreciation *ab initio* would unreasonably subject the shippers to the burden of twice compensating the Carriers for a portion of their investment and contravene RCA's mandate to set just and equitable rates.

### 3. Evidence Rule

The Carriers and the State argue that RCA's factual finding that the Carriers actually collected TSM depreciation over a twenty-year period violates a public policy against use of settlement negotiations in subsequent proceedings involving settling parties. They cite Alaska Rule of Evidence 408 and associated case law. Appellees counter that the rule is irrelevant because it only proscribes use of settlement to prove a disputed claim but does not preclude the shippers from proving such factual matters as the quantum of accumulated depreciation. Rule 408 reads in relevant part as follows:

> Evidence of (1) furnishing or offering or promising to furnish ... a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

The court agrees with appellees that the rule is inapposite. By way of analogy, if two competitors settle a dispute by agreeing to fix prices, a victimized consumer is not precluded from proving the bargain to establish damages. Here the State and the Carriers agreed, *inter alia,* on amounts to be charged shippers for depreciation. The shippers sought an accounting. Without the settlement as Exhibit No. 1, RCA's findings would be divorced from reality.

The TAPS settlement can have no more gravitational force than APUC accorded it. APUC never found it just and reasonable. Instead, the State and the Carriers requested a finding that the public interest was served by the cessation of near-decade long rate litigation. The State's 1986 supporting brief emphasized that APUC retained unfettered discretion in future third-party rate cases:

> [T]he Commission retains full jurisdiction over intrastate TAPS tariffs; any non-signatory to the agreement ... may seek to challenge a tariff filed pursuant to the settlement regardless of whether the tariff complies with the terms of the settlement.... [T]his commission is absolutely free—as it should be—to establish whatever TAPS tariff rates it finds are consistent with the statutory requirement.

Subsequently Petro Star, an affected intrastate shipper not bound by the agreement, filed a rate protest which was settled in 1993. The APUC decreed that any future rate challenges would proceed without deference to the TAPS settlement.[35]

The State fails to explain why, if RCA remained "absolutely free" to establish any tariff consistent with the Pipeline Act, it could not look to the TAPS settlement to measure accumulated depreciation for purposes of a rate-base calculation. Under appellants' analysis, the TAPS settlement commits third parties and RCA to a particular approach in the instant rate adjudication. Perhaps several billion dollars of already recovered depreciation must be included in the midstream rate base.

The court believes such an outcome far exceeds the quite limited imprimatur of approval the APUC accorded the TAPS settlement. The settling parties understood and the APUC announced that the TAPS settlement carried with it no binding effect in subsequent third-party rate protests. To now accord the profound effect urged by the Carriers and the State pursuant to Alaska Rule of Evidence 408 would vest the settlement with a force contrary to the representations of the settling parties and to the APUC's caveat when it accepted the settlement.

### d. Capital Structure

■ ▪ The Carriers, but not the State, appeal on the ground that the hypothetical capital structure adopted by RCA for the years 1997–2000 included too much debt and too little equity. They allege that no reasonable basis supports this, charging RCA with arbitrarily departing from its own precedents. They urge review with "heightened scrutiny."

The capital structure of a regulated entity affects its rates. Investors pay income tax on revenues derived from equity capital but not on debt-attributable revenues matched by deductible interest payments. A component of the rate formula holds investors harmless from taxes. Consequently higher levels of equity versus debt financing generally lead to higher rates. Rate makers determine the appropriate capital structure. No party contended that the actual capital structures of the Carriers should be used, in part because the Carriers are limited-purpose subsidiaries which likely could not stand alone. The Carriers instead argued that a composite of the capital structures of the parent oil-producing companies should be used, resulting in a presumed Carrier equity in the pipeline of 75–77% from 1997–2000, or on average 68% from 1968–2000. Tesoro urged that the parent companies were an inappropriate paradigm. RCA accepted Tesoro's model based on a proxy group of stand-alone oil and gas pipeline companies operating in other states, which averaged 50.5% equity.

Tesoro expert Frank Hanley testified that the capital structure should be consistent with prospective levels of business risk of an enterprise as revealed by the capital structures of similarly situated companies. He analyzed the capital structures of the Carriers' parent companies, comparing that data to a proxy group of five oil pipeline holding companies and four gas pipelines companies, plus twelve subsidiary gas pipeline companies. Hanley noted that the Carriers' parent

---

**35.** *Re Amerada Hess Pipeline Corp.,* 13 APUC 448, 456 (1993).

companies included several of the largest integrated oil companies in the world, with high-risk operations of global scope. He contrasted them to the Carriers, regulated operating oil-pipeline companies in an American state, and concluded that the Carriers were more aptly likened to stand-alone pipeline companies than to the major producer-refiner-petrochemical parent companies.

The five proxy oil pipeline companies averaged 49% equity during 1995–99. For 1999 alone, their average equity was 50.5%. The four gas holding companies averaged 43.7% equity during 1995–99, but only because they were bloated with debt from recent mergers and acquisitions; Mr. Hanley therefore discounted them, and instead relied on the capital structures of the twelve subsidiary gas pipeline companies. Their five-year average equity was 51.6%. Their 1999 equity was 50.7%. Mr. Hanley concluded that in the real world, stand-alone operating pipeline companies subsist with a capital structure of approximately 50.5% equity and 49.5% debt.

Carrier expert William Tye addressed the issue of capital structure in his pre-filed testimony. He concluded the average composite capital structure for the Carriers' parent companies should control, but provided no particular reason why this was preferable to a capital structure derived from stand-alone pipeline companies. He testified that the composite capital structure of the parent companies was 22.7% debt to 77.3% equity at year-end 1997.

The issue of the deemed capital structure for TAPS is technical and peculiarly within RCA's expertise. With contrary expert testimony before it, RCA made a plausible decision that the paradigm should be operating pipeline companies rather than oil-producing and refining companies. This court is precluded from second-guessing that conclusion because it is supported by reasonable evidence in the record viewed as a whole.

e. Risk Premium

■ The Carriers contend that RCA imputed an inadequate risk premium to compensate lenders and equity investors for purportedly extraordinary risks inherent to the project. They urge that expert witnesses Dr. Tye and Dr. Gaske aptly estimated the low end of a reasonable risk premium to be 2% on debt and equity, and that RCA erred by assessing a parsimonious .75% risk premium on equity alone.

Dr. Tye's pre-filed testimony about risk discusses, in an abstract and conclusory fashion, such considerations as the propriety of putting $10 billion investor eggs in one basket; risks of non-completion or non-viability; legal obstacles; escalating construction costs; decreasing world oil prices; possible regulatory setbacks; and Alaska's extreme climate and geography. He concluded that a risk premium should range from 2–5%.

RCA's Order No. 151 adopted the Carrier's methodology for computing a risk premium including a prospective view of risks that, in hindsight, proved evanescent. It rejected rote reliance on the data inputs proposed by any one testifying expert. RCA concluded that cited academic studies regarding the risks of unrelated high-cap or high-tech projects like tunnels, subways, airports, toll roads, and power plants were quite possibly apples to oranges comparisons. It decided that, to the extent the pipeline was ever an all-or-nothing gamble, such risk spanned the planning stage only. RCA therefore awarded a risk premium for non-completion due to regulatory and legal uncertainties limited to that stage. It augmented this risk premium for the contingency of cost overruns during construction. In other respects RCA found TAPS less risky than an average pipeline. There was a low risk of inadequate supply of oil; a low risk of competition from alternative carriers; no extra risk of throughput interruption; and no risk of a volatile regulatory climate.

The Carriers argue that a risk premium should be applied to the entire capital structure, both debt and equity. RCA's analysis focuses on the risks to equity investors and does not specifically discuss the risk to lenders in this context. Presumably, the risk to lenders is reflected in the interest rates they charge, for which the Carriers are directly reimbursed in the rate formula. In a related context, RCA noted that TAPS could be ex-

pected to generate funds to cover debt service under almost any scenario. It appears that Dr. Tye was the sole witness to unequivocally endorse a risk premium on debt. RCA was not required to accept his seemingly idiosyncratic approach to risk.

RCA's risk analysis was extraordinarily thoughtful and complete. It addressed the contentions and evidence of all parties. It supported its analysis with a thirteen-page single-spaced endnote with eighty-eight citations to the record or to prior cases. It merits the deference courts must apply when reviewing complex decisions implicating agency expertise. This court sustains RCA's findings as supported by the record.

### f. Return on Equity

█ The Carriers argue that RCA departed from precedent without adequate explanation when it expanded its purview beyond principle reliance on a discounted cash flow ("DCF") methodology for determining the appropriate rate of return on equity. Instead, RCA averaged the results of four different methodologies.

Order No. 151 states in relevant part:

The parties largely failed to successfully rebut each other's various approaches to determining return on equity. For the most part, the record fails to provide a theoretical or empirical basis for deciding whether any particular method is more appropriate than another. The record also fails to suggest that any of the expert witnesses have applied their chosen methods inappropriately, or have chosen inappropriate data or parameters. We find Tesoro's expert witness to be the most credible. We base our rate of return findings primarily upon Tesoro's witness's recommendation. Tesoro sponsors multiple methods because it believes investors rely on the widest possible information available. We agree with Tesoro that investors are aware of all the various traditional cost of common equity models discussed in financial literature. Absent good reason for believing that investors weight

the results of one method more heavily than another in their assessment of an appropriate rate of return, it is reasonable to hold that investors ascribe weight to them all. We note that the APUC has relied on a variety of methods when those methods were reliable given the specific facts at hand.

In addition, we find Tesoro's DCF analysis the most reliable ... we primarily rely upon Tesoro's recommendation....

This passage supports the Carriers' argument that RCA stepped beyond a primary reliance on a DCF methodology to a more catholic acceptance of other methods. But RCA more than adequately explained its reasoning. It found Tesoro's Mr. Hanley to be a compelling expert witness. He, unlike others, testified about how investors actually tick. RCA preferred subtleties of Mr. Hanley's DCF methodology, as compared to other DCF presenters.

The quoted excerpt from RCA's rate of return analysis reveals that the area is technical; that competing theoretical models are well developed; that RCA understood what it was doing; and that it was thoughtful, conscientious, and discursive. RCA had a reasonable rather than an arbitrary basis, supported by the record, for its approach. A reviewing court is not entitled to probe further. RCA has adequately explained any departure from agency precedent and is supported by the record in arriving at its rate of return conclusions.

### g. Retroactive Ratemaking

█ ■ Retroactive ratemaking is a regulatory taboo in Alaska and a majority of jurisdictions.[36] Rates may only be altered prospectively, without any attempt to recapture past excess profits, or to redress deficient past revenues. This protects the reliance interest of a utility and its customers in the stability of rates filed by a utility and approved by regulators. In Order No. 151 RCA found that pursuant to TSM the Carriers had the "opportunity" to collect an undeserved $9.9 billion. Yet RCA properly considered any such excess profit as moot, and

---

**36.** *Matanuska Elec. Ass'n v. Chugach Elec. Ass'n,* 53 P.3d 578 (Alaska 2002).

nothing in Order No. 151 purports to reduce or adjust the 1997–2000 rate structure to account for prior revenue anomalies.

Nonetheless the Carriers argue that RCA's use of TSM accelerated depreciation to calculate the year-end 1996 rate base "squarely" transgressed the retroactive rate-making prohibition. The argument is predicated on the notion that the 1982 straight-line depreciation stipulation was not superseded by the TAPS settlement agreement, a contention RCA rejected. RCA permissibly found that TSM accelerated depreciation was actually used by the Carriers to compute their rates prior to the instant rate challenge. This finding renders the retroactivity argument untenable. RCA did not meddle with prior rates. It simply parsed a highly customized private settlement to determine what portion of past revenues should fairly be allocated to depreciation.

■ The Carriers argue that rates pursuant to Order No. 151 should be prospective from its date of issuance, and that the Carriers need not refund excess revenues collected under TSM during 1997–2000 while the rate challenge was pending. The Carriers characterize TSM as sufficiently long-lived by 1997 that it had been *de facto* ratified by RCA. As such TSM had become impervious to any but the prospective modification allowed in RCA-initiated challenges of previously approved rates under AS 42.06.410(a).

RCA found to the contrary in Order No. 151. It held that it had properly suspended the 1997–2000 tariff filings, i.e. it had allowed the rates provisionally subject to post-hearing refunds pursuant to AS 42.06.400. That statute governs revised rates filed by Carriers and judged anew by RCA under its "just and reasonable" standard.

Prior to Order No. 151, TAPS tariffs were never approved by RCA as just and reasonable. The initial rates filed in 1977 were challenged. The parties engaged in protracted and expensive litigation until they arrived at a mutually acceptable but *sui generis* rate-making methodology in 1985. The State and the Carriers alike essentially urged APUC to

forgo substantive evaluation of TSM. The State affirmatively argued that APUC could rekindle its inquiry upon any future third-party rate challenge. APUC expressly reserved the right to evaluate rates anew without prejudice from its acquiescence in TSM. The power to suspend rates is a significant adjunct to a rate challenge. Since a rate challenge may demonstrably take years to resolve, RCA cannot do complete justice to a protestant absent a power to affect rates from the time of challenge.

When rate litigation recommenced in 1997, its character as a review of unapproved rates was intact. Neither Tesoro nor Williams was a party to the TAPS settlement and so neither was bound thereby. They properly sought the review of TSM that was interrupted in 1985. These facts fall within AS 42.06.400's procedure for evaluation of a carrier-generated rate filing. In contrast, AS 42.06.410, which does not permit suspended rates, would more aptly apply if RCA had *sua sponte* initiated review of rates in which parties enjoyed decisively vested reliance rights, because the rates had previously been found just and reasonable. RCA appropriately distinguished cases cited by the Carriers for a contrary conclusion.

h. Unitary TAPS Rate

■ The Carriers are wholly owned subsidiaries of oil-producing companies. Each Carrier owns an undivided joint interest in the pipeline. The Carriers have jointly formed the Alyeska Pipeline Service Company ("Alyeska") to manage, maintain and operate the pipeline. Each Carrier holds its own certificate of convenience to operate an oil pipeline. In-state consumers such as Tesoro and Williams contract with individual Carriers and are invoiced directly.

In 1983, the Superior Court invalidated individual rates approved by APUC, finding TAPS to be a unity and not eight virtual pipelines.[37] At the request of the parties post-TAPS settlement, that decision was vacated. Thereafter, the Carriers filed rates not exceeding the TSM ceiling; per the settlement, those rates were immune from State

---

**37.** *State v. Alaska Pub. Util. Comm'n,* 3AN 80–7163 CI (Alaska Super.1983).

challenge. The matter of individual rates became a regulatory non-issue.

During the instant rate litigation, Carrier and shipper experts agreed RCA should impute to all Carriers identical capital structures with a deemed debt to equity ratio, common interest rates for borrowed capital, and a collective rate of return. The Carriers opted to defend TSM, not with individualized cost data, but instead with an overarching "benchmark" economic model. RCA rejected the model, disagreeing with its inputs and assumptions. RCA set a date for the Carriers to file individual rates based on proof of prudent individual costs, but only so long as the total revenues from all individually and jointly-filed rates did not exceed RCA's revenue entitlement set forth in Order No. 151.

On January 27, 2003, three Carriers filed individual rates for 1997–2000. The ensuing revenue total exceeded RCA's figure. The Carriers again declined to support their filings with individualized cost data. RCA rejected the individual rates, and made final the rates established in Order No. 151. The Carriers and the State appeal.

The parties engage in statutory construction of the Pipeline Act to support their positions. For example, the Carriers discern a clarion legislative mandate that each may file its own rates to be scrutinized in isolation by RCA.[38] Tesoro discerns a "clear" discretionary authority to set a common rate.[39] The State finds it "inescapable" that the Pipeline Act requires individual rates.

In Order No. 151, RCA concluded that AS 42.06.630(17) defines "tariff" to mean a "rate" for a "pipeline facility" for services "fur-nished by the facility" and not a rate for each individual owner of the pipeline facility. Further, from AS 42.06.370(a), "All rates demanded or received by a pipeline carrier or by any two or more pipeline carriers jointly ... shall be just and reasonable," RCA inferred authority for a single rate imposed on joint owners. Finally, RCA found that nothing in the Pipeline Act precluded it from setting a single rate upon rejection of filed individual rates as unjust and unreasonable.

The parties cite no legislative history. The referenced statutes do not explicitly address the issue. The statutes to which the parties and RCA attribute controlling significance do not definitively reveal a plain meaning.

RCA twice afforded the Carriers an opportunity to file rates supported by actual cost data. The Carriers persisted in their more theoretical rate defense. RCA rejected this approach. The Carriers have not shown that RCA's requirements were arbitrary or capricious. Irrespective of the validity of its decision to cap aggregate revenues from individual and joint rates, RCA had an adequate and independent basis to reject individual rate filings by three Carriers, for failure of proof. Absent a compliant defense of the filed rates, RCA can in a sense be viewed as setting individual rates for all Carriers; the individual rates are identical, because no carrier distinguished itself from the pack.

The State argues that the Carriers have filed individual rates for years, and RCA has departed from precedent without adequate explanation. The State does not provide record cites proving prior price competition. Tesoro contends that no TAPS Carrier has

---

**38.** TC Init. Br. 123–24, citing variously AS 42.06.630(15) (defining "pipeline carrier" as "the owner," including corporations organized under the laws of the United States or of any state of any pipeline ... any interest in it); AS 42.06.245 ("[T]he requirements of this chapter for permits and certificates of public convenience and necessity ... apply to ... a pipeline or pipeline carrier."); AS 42.06.350(a) ("every intrastate oil pipeline carrier shall file ... all rates ... pertaining to service provided under the certificate"); AS 42.06.140(3) (RCA shall "require just, fair, and reasonable rates ... for pipeline carriers"); and AS 42.06.370(a) (requiring that "all rates demanded or received by a pipeline carrier be just and reasonable").

**39.** Tesoro Br. 119–20, citing AS 42.06.140 (broad general regulatory powers); AS 42.06.370(a) (rates charged by "a pipeline carrier, or by any two more pipeline carriers jointly" shall be just and reasonable); AS 42.06.630(a) ("tariff" means a "rate ... of a ... pipeline facility relating to services furnished by the facility"); AS 42.06.630(15) ("pipeline carrier" means the "owner, including corporations ... of any pipeline"); AS 42.06.630(14) ("pipeline" or "pipeline facility" includes "all the facilities of a total system of pipe").

ever charged anything but the TSM ceiling, citing testimony to that effect.[40] RCA concluded that the record was insufficient to determine whether the TAPS Carriers ever engaged in price competition amongst themselves.

Tesoro represents that the five Carriers have no employees. The pipeline itself is operated by Alyeska Pipeline Service Company, which presumably bills the Carriers based on their respective percentages of ownership. Significant items such as debt to equity ratio, cost of borrowed capital, risk factors, and rate of return are imputed to the Carriers in common; the Carriers fault the numbers but not the joint imputation. Individually incurred Carrier expenses may well be a microscopic factor in the rate equation, given that the parties jointly operate the pipeline through Alyeska on a shared-cost basis, and are otherwise imputed invariant capital structures, interest rates, risk factors, and rates of return. The parties do not discuss the extent of the administrative burden imposed on RCA by any statutory mandate to set individual rates.

RCA's total revenue cap means that Carriers seeking leave to exceed the unitary rate initiate a zero-sum game; some other Carrier must elect to charge less, so that total revenue remains constant. The scenario is unrealistic. In practical effect, Order No. 151 establishes a unitary rate; its individual rate provision is illusory as to Carriers seeking a rate premium, given the cap.

The court concludes that interpretation of RCA's enabling statutes to arrive at practical parameters requires administrative expertise. RCA's decision to set a unitary rate or highly conditioned individual rates for this jointly owned and operated pipeline applies agency expertise to a fundamental policy question. RCA's interpretation of the Pipeline Act is entitled to deference. RCA's conclusion regarding the statutory scope of its discretion is reasonable and must therefore be sustained by this court.[41] Its exercise of this discretion is supported by the record.

i. Interest Rate

■■■ RCA ordered refunds to affected shippers. Alaska Statute 42.06.400(b) states that the difference between a temporary and permanent tariff, in favor of either a carrier or a shipper, shall bear interest at the rate set forth in AS 45.45.010(a), or 10.5%. RCA so ordered.

The Carriers argue that AS 42.06.400(b) was at least impliedly repealed by the 1997 amendment to the Code of Civil Procedure at AS 09.30.070(a) which established the interest due on civil judgments "[n]otwithstanding AS 45.45.010." The statute applies a floating interest rate based on the Federal Reserve discount rate to judgments in civil litigation filed in the superior or district court. The annual rate may be greater or lesser than the 10.5% legal rate of interest established in AS 45.45.010 for other purposes. For 2006, the floating rate for civil judgments is 8.25%.

The amendment of AS 09.30.070 was a component of a comprehensive tort reform act. The legislature's intent to relieve society of perceived excesses or irrationalities in civil litigation was discussed in *Evans ex rel. Kutch v. State*:

> The legislative goals underlying the damages caps, as well as the rest of chapter 26, SLA 1997, are explicitly stated in chapter 26, section 1, SLA 1997. Specifically, section 1 states that the legislation was intended to (1) discourage frivolous litigation and decrease the costs of litigation; (2) stop "excessive" punitive damages awards in order to foster a "positive" business environment; (3) control the increase of liability insurance rates; (4) encourage "self-reliance and independence by underscoring the need for personal responsibility"; and (5) reduce the cost of malpractice insurance for professionals.[42]

Nothing in the Tort Reform Act's stated rationale suggests a more general purpose to repeal the legal interest rate applicable outside the context of tort and contract cases. Had the legislature wished to repeal the

---

40. *See* discussion *supra* at ¶ III(c)(2).

41. *DeNuptiis v. Unocal Corp.*, 63 P.3d 272 (Alaska 2003).

42. 56 P.3d 1046, 1053 (Alaska 2002) (footnotes omitted).

interest provision of the Pipeline Act when it passed tort reform legislation in 1997, it would logically have done so expressly, and indicated why it was ranging so far a field from its statement of intent. Nothing in the Tort Reform Act evinces an intention to affect anything but tort and contract litigation. Alaska Statute 09.30.070(b) is specifically tailored to tort and contract claims, linking the initial interest accrual date to written notice of a claim; the provision makes little sense in RCA's sphere. RCA appropriately followed the mandate of the Pipeline Act to order interest at the legal rate set forth in AS 45.45.010.

## IV. CONCLUSION

This court affirms the decision of RCA in all respects. Points on appeal not specifical-ly addressed in this decision are denied as without merit.

Dated this 18th day of January, 2006 at Anchorage, Alaska.

/s/ John Suddock
Superior Court Judge