**Electronically Filed
Supreme Court
SCAP-14-0000873
02-DEC-2015
12:58 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

MAUNA KEA ANAINA HOU; CLARENCE KUKAUAKAHI CHING; FLORES-CASE 'OHANA; DEBORAH J. WARD; PAUL K. NEVES; and KAHEA: THE HAWAIIAN ENVIRONMENTAL ALLIANCE, a domestic non-profit corporation,
Appellants-Appellants,

vs.

BOARD OF LAND AND NATURAL RESOURCES, STATE OF HAWAI'I; DEPARTMENT OF LAND AND NATURAL RESOURCES, STATE OF HAWAI'I; SUZANNE D. CASE, in her official capacity as Chair of the Board of Land and Natural Resources and Director of the Department of Land and Natural Resources; and UNIVERSITY OF HAWAI'I AT HILO,
Appellees-Appellees.

SCAP-14-0000873

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CAAP-14-0000873; CIV. NO. 13-1-0349)

DECEMBER 2, 2015

RECKTENWALD, C.J., NAKAYAMA, AND McKENNA, JJ.,
WITH POLLACK, J., CONCURRING SEPARATELY,
WITH WHOM WILSON, J., JOINS,
AND WITH WHOM McKENNA, J., JOINS AS TO PART IV

OPINION OF THE COURT BY RECKTENWALD, C.J.

This case requires us to determine whether the procedure followed by the Board of Land and Natural Resources (Board or BLNR) in issuing a permit to construct an observatory in a conservation district[1] comported with due process.

Specifically, the University of Hawaiʻi at Hilo (UHH) applied for approval from the Board to construct the Thirty Meter Telescope (TMT) on Mauna Kea on the island of Hawaiʻi. The Board held two public hearings on the application, at which more than 80 people spoke. Proponents asserted that the "next generation" large telescope would facilitate cutting-edge scientific research that could not be conducted as effectively anywhere else. Opponents included Native Hawaiians who stated that the summit area was sacred in Native Hawaiian culture and that the construction of the eighteen-and-one-half-story high observatory would be a desecration.

---

[1] Hawaiʻi Revised Statutes (HRS) § 183C-1 (1994), containing the findings and purpose of Conservation Districts, provides:

> The legislature finds that lands within the state land use conservation district contain important natural resources essential to the preservation of the State's fragile natural ecosystems and the sustainability of the State's water supply. It is therefore, the intent of the legislature to conserve, protect, and preserve the important natural resources of the State through appropriate management and use to promote their long-term sustainability and the public health, safety and welfare.

The Board scheduled UHH's application for action at a public board meeting in February 2011.  Various opponents of the application spoke at the meeting and requested that the Board delay action on the permit until it could conduct a contested case hearing, at which evidence concerning the application could be presented under oath and subject to cross-examination.

Despite those objections, the Board voted to approve the permit at the meeting, subject to a number of conditions.  It also took two further steps that are relevant here.  First, acting on its own motion, it directed that a contested case hearing be conducted.  Second, it included a condition in the permit that no construction could be undertaken until the contested case hearing was resolved.

Subsequently, the Chair of the Board appointed a hearing officer to conduct the hearing, which took place over the course of seven days in 2011.  In 2012, the hearing officer recommended that the permit be approved, subject to essentially the same conditions as originally imposed by the Board.  The Board adopted that recommendation in 2013, and the Circuit Court of the Third Circuit affirmed the Board's action.  Appellants, who oppose the issuance of the permit and who include several of the people who requested that the Board not act on the application until after the contested case hearing was held,

3

appealed to this court.

The question we must answer is whether the approval of the permit <u>before</u> the contested case hearing was held violated the Hawaiʻi Constitution's guarantee of due process, which provides that, "No person shall be deprived of life, liberty or property without due process of law . . . ."  Haw. Const. art. I, § 5.  We hold that it did.

A "fair trial in a fair tribunal is a basic requirement of due process." <u>Sifagaloa v. Bd. of Tr. of Emp. Ret. Sys.</u>, 74 Haw. 181, 189, 840 P.2d 367, 371 (1992) (quoting <u>In re Murchison</u>, 349 U.S. 133, 136 (1955)).  While the specifics of that guarantee can vary depending on the circumstances, in the instant case the Appellants were entitled to a contested case hearing and had unequivocally requested one before the Board voted on the permit at its February 2011 meeting.  A contested case hearing is similar in many respects to a trial before a judge:  the parties have the right to present evidence, testimony is taken under oath, and witnesses are subject to cross-examination.  It provides a high level of procedural fairness and protections to ensure that decisions are made based on a factual record that is developed through a rigorous adversarial process.

By voting on the permit before the contested case hearing was held, the Board denied the Appellants their due

4

process right to be heard at "a meaningful time and in a meaningful manner."  Sandy Beach Def. Fund v. City & Cnty. of Honolulu, 70 Haw. 361, 378, 773 P.2d 250, 261 (1989).  The Board was on record in support of the project, and the permit itself was issued before evidence was taken and subject to adversarial testing before a neutral hearing officer.  While UHH and the Board argue that the February 2011 decision was "preliminary" and subject to revision, the fact remains that the Board issued the permit prior to holding the contested case hearing.  This procedure was improper, and was inconsistent with the statutory definition of a contested case as "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing."  HRS § 91-1(5) (emphasis added).

Such a procedure lacked both the reality and appearance of justice.  As this court noted in Sifagaloa:

> The Supreme Court teaches us . . . that justice can "perform its high function in the best way [only if it satisfies] the 'appearance of justice.'"  For in a popular government, "'justice must not only be done but must manifestly be seen to be done . . . .'"

74 Haw. at 189-90, 840 P.2d at 371 (quoting Offutt v. United States, 348 U.S. 11, 14 (1954), and Murchison, 349 U.S. at 136).

The process followed by the Board here did not meet these standards.  Quite simply, the Board put the cart before the

horse when it issued the permit before the request for a contested case hearing was resolved and the hearing was held. Accordingly, the permit cannot stand.[2]  We therefore vacate the judgment of the circuit court and the permit issued by the Board, and remand so that a contested case hearing can be conducted before the Board or a new hearing officer, or for other proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  BLNR proceedings

#### 1.  Conservation District Use Application and Permit

On September 2, 2010, UHH submitted to the Department of Land and Natural Resources a Conservation District Use Application (CDUA) for the TMT.  UHH submitted the application on behalf of TMT Observatory Corporation, a private non-profit corporation, which proposed the TMT in partnership with the University of California, the California Institute of Technology, and the Association of Canadian Universities for Research in Astronomy; the National Astronomical Observatory of Japan was

---

[2]    Appellants also argue that their due process rights under the United States Constitution have been violated, that BLNR's findings and conclusions did not satisfy HAR § 13-5-30(c), the permit lacked an adequate underlying management plan, and BLNR failed to meet its obligations to protect and preserve customary and traditional Native Hawaiian rights.  Due to the disposition of this case on a threshold issue, this court does not address Appellants' additional arguments.  See United Pub. Workers, AFSCME Local 646 AFL-CIO v. Hanneman, 106 Hawaiʻi 359, 360, 105 P.3d 236, 237 (2005) (declining to address other issues where appeal disposed on a preliminary issue).

noted to be a "collaborator and potential partner," and the National Astronomical Observatories of the Chinese Academy of Sciences and India's Department of Science and Technology were noted to be "observers and potential partners."

The application proposed an astronomy observatory and ancillary facilities and access roads on a site of roughly five acres on the upper slopes of Mauna Kea. The proposed site was within the astronomy precinct of the Mauna Kea Science Reserve, which is within the Conservation District Resource subzone. The CDUA stated that as of mid-2010, thirteen astronomical facilities were operational on Mauna Kea. It explained that observatories were attracted to Mauna Kea "principally because of the superb viewing conditions that its high-altitude/mid-oceanic location provides," and noted the "intellectual and physical support infrastructure that has developed around the [astronomy] complex." The CDUA added that these factors "have helped Hawaiʻi become one of the most important centers for astronomical research in the world."

The proposed observatory consisted of a telescope thirty meters in diameter, attached instruments to record data, an enclosing dome, an attached building to house support and maintenance facilities, and parking. The CDUA also proposed a TMT Access Way, consisting of an improved road and underground

utilities improvements to connect the TMT with other existing roads and utilities, and temporary use of an existing four-acre staging area for materials during construction. The CDUA also proposed to upgrade existing underground electrical wiring, electrical transformers, and related equipment within a nearby substation.

On December 2 and 3, 2010, BLNR held public hearings on the CDUA in Hilo and Kailua-Kona, respectively. Approximately 200 individuals attended the hearings, 84 of whom testified, and a number of individuals and groups provided written comments before and after these hearings. A range of opinions were expressed in support of and against the CDUA, and at least 6 individuals or groups requested a contested case hearing verbally, in writing, or both.

In the weeks that followed, Samuel Lemmo, Administrator of the Office of Conservation and Coastal Lands, and Michael Cain, Staff Planner for the Office of Conservation and Coastal Lands, completed a staff report for BLNR that summarized the CDUA and public comments, including the requests for a contested case hearing, and recommended that BLNR approve the CDUA and issue a Conservation District Use Permit (CDUP). The staff report also recommended twenty-one conditions for the permit. Other than noting that requests for a contested case hearing had been

received, Lemmo and Cain did not at that time recommend that BLNR hold a contested case hearing.

On February 17, 2011, BLNR advised UHH, Mauna Kea Anaina Hou, Deborah Ward (Chairperson of Sierra Club, Hawaiʻi Chapter), Miwa Tamanaha (Executive Director of KAHEA), Fred D. Stone, and Clarence Kukauakahi Ching that BLNR would "consider" the application at its regularly-scheduled meeting on February 25, 2011, and would also consider

> a request for decision-making by the Board (a) on its own motion hold [sic] a contested case hearing or grant requests by Mauna Kea Anaina Hou, Fred Stone, KAHEA Environmental Alliance, Kukauakahi (Clarence Ching), and Sierra Club for a contested case hearing, and (b) appoint a hearings officer and delegate to the Chairperson the authority to select said hearings officer to conduct all hearings for one (1) contested case hearing.

On February 25, 2011, BLNR's Chair began BLNR's regularly-scheduled public board meeting by asking members of the public to limit their testimonies to no more than five minutes each.

Lemmo then gave a presentation explaining the recommendation for approval of the application and issuance of a permit.  A summary of that presentation, as reflected in the meeting minutes, spans nearly five pages single-spaced.  He verbally supplemented the staff report with several additional recommended conditions, including the condition that:  "If a

9

contested case proceeding is initiated no construction shall occur until a final decision is rendered by the Board in favor of the applicant or the proceeding is otherwise dismissed."

After Lemmo spoke, forty-one individuals testified either for or against the application, which included several more requests for a contested case hearing and objections to BLNR issuing a permit before holding a contested case hearing. For example, Marti Townsend, Program Director of KAHEA: The Hawaiian Environmental Alliance (KAHEA), testified to her belief that before a contested case hearing was held, BLNR could only "defer or deny" issuance of a permit:

> She referred to written testimony she submitted earlier pointing out a diagram that explains how the contested case process is supposed to work. There is no arrow from the Board making the decision to contested case decision and back and that's because the contested case hearing process is not a motion for reconsideration. It's not saying hey Board you made a mistake and you need to consider this information and re-vote. It's a process for you to collect information because in these kinds of meetings we only have five minutes to speak we don't get to cross examine witnesses. The actual facts don't get to you, at least not in the way that it should so you can make an informed decision. Today your only options for decision making are to defer the permit until the completion of the contested case or to deny the permit.

Clarence Kukauakahi Ching stated that "BLNR is not ready to grant an unconditional CDUP at this time and shouldn't be. A conditional CDUP might work in the interim."

Kealoha Pisciotta, President of Mauna Kea Anaina Hou,

explained to BLNR:

> [W]e've asked for a contested case hearing . . . .
> The procedural problem here is that a contested case
> hearing has to go before a permit approval. . . .
> [T]he reason is because contested case hearings is
> [sic] to make sure citizens like us that don't have
> standing don't have to go into court.  The contested
> case hearing is a process whereby you're allowed to
> present facts and information to the decision makers
> (the Board) via the hearing process so you can make an
> informed decision.  But, if you make your decision
> before like if it is approved today then you grant the
> contested case hearing. [sic] There is no point
> . . . .  What I am asking you guys is to consider that
> we don't put process "B" before process "A"?  It is
> equivalent to a Judge ruling before he has the
> evidence so I don't know why it's gone on like this,
> but we've had this problem before. . . .

Jonathan Osorio, a University of Hawaiʻi at Mānoa Professor of Hawaiian Studies and board member of KAHEA, also objected to issuing a permit before a contested case hearing. Professor Osorio explained that although he was not a religious practitioner, he was deeply concerned as a historian of how telescopes have "proliferated" on Mauna Kea, and was also concerned by what he believed was an insufficient amount of revenues received from this type of project.  Professor Osorio compared BLNR to konohiki[3] and aliʻi,[4] who were faced with decisions to allocate resources, including "how they were used to

---

[3]     Konohiki is defined as "Headman of an <u>ahupuaʻa</u> land division under the chief[.]"  Mary Kawena Pukui & Samuel H. Elbert, <u>Hawaiian Dictionary</u> 166 (rev. ed. 1986).

[4]     Aliʻi is defined as "Chief, chiefess, officer, ruler, monarch, peer, headman, noble, aristocrat, king, queen, commander[.]"  Pukui & Elbert, <u>Hawaiian Dictionary</u>, at 20.

develop." He cautioned:

> You have a difficult decision to make here. It may very well be that what we need to do is look at this and give a contested case hearing a chance to present more information, more facts and more people having access to give these kinds of testimonies before you can make a decision. We definitely do not believe that you should make a decision today.

BLNR member Robert Pacheco asked Lemmo to respond to these comments that a contested case hearing must occur before BLNR decided. Lemmo responded:

> [W]e have old rules Chapter 13-1, Rules of Practice and Procedure which have a section on the conduct of the contested case hearings. Under these old rules which are no longer in effect and have been replaced, an entity could ask for a contested case hearing at the required public hearing for the project which occurred long before this came before this body. The practice had developed of having a contested case when somebody asked for a contested case at the public hearing for the CDUP which is long before a decision is made. The rules were changed about five or six years ago which essentially seemed to now allow the Board to make a decision even with a pending request for a contested case hearing before you. Should a contested case hearing be required or held after that you go through that process and it would come back to you (the Board) again and you would rule on that.

BLNR then voted unanimously to approve the application and issue a permit. BLNR adopted the conditions recommended in the staff report and the additional conditions that Lemmo recommended at the meeting, including the condition that, "If a contested case proceeding is initiated, no construction shall occur until a final decision is rendered by the Board in favor of the applicant or the proceeding is otherwise dismissed."

Pisciotta then asked whether, in the event a contested

12

case hearing occurred and the hearing officer disagreed with issuance of the permit, BLNR would "rescind the permit that they just approved[,]" and questioned how BLNR would prevent construction. BLNR minutes reflect the following response:

> Chair Aila said that with regards to the [construction] one of the conditions of the CDUP that they just approved is that no construction can begin until the contested case hearing is adjudicated. <u>Mr. Lemmo said final decision making has been made.</u> Chair Aila said there are no bulldozers up there. There is a difference of opinion on how those rules are applied. Ms. Pisciotta agreed which will be figured out by the court. Still the purpose is to allow the decision makers to make an informed decision and you can't make an informed decision unless you have all the information at hand that is why we are suppose [sic] to have contested hearings before we have decision making because a contested case hearing is not a motion for reconsideration. Member Pacheco said this body makes decisions all the time that can go into contested case hearing and comes back to us right away.

(Emphasis added).

Subsequently, at this same meeting, BLNR voted unanimously to hold a contested case hearing.

A few days later, in correspondence dated March 3, 2011, regarding "Conservation District Use Permit (CDUP) HA-3568," BLNR formally advised UHH that "on February 25, 2011, the Board of Land and Natural Resources approved Conservation District Use Permit (CDUP) HA-3568 for the Thirty Meter Telescope at the Mauna Kea Science Reserve," subject to conditions. BLNR included the same conditions that were approved at the February 25, 2011 meeting.

13

Pertinent conditions included:

5. Before proceeding with any work authorized by the Board, the applicant shall submit four copies of the construction and grading plans and specifications to the Chairperson or his authorized representative for approval for consistency with the conditions of the permit and the declarations set forth in the permit application. Three of the copies will be returned to the applicant. Plan approval by the Chairperson does not constitute approval required from other agencies;

6. All representations relative to mitigation set forth in the Environmental Impact Statement and Conservation District Use Application are incorporated as conditions of the permit;

7. All mitigation measures and management actions contained in the Historic Preservation Mitigation Plan, Construction Plan, Historical & Archaeological Site Plan, Maintenance Plan, and Anthropod Monitoring Plan, are incorporated as conditions of this permit;

. . .

9. The TMT Management Plan is approved, including all specific management actions articulated in the TMT Management Plan including, Cultural Resources Management, Natural Resources Management, Education & Outreach, Astronomical Resources, Permitting and Enforcement, Infrastructure and Maintenance, Construction Guidelines, Site Recycling, Decommissioning, Demolition & Restoration, Future Land Uses, and Monitoring, Evaluation & Updates. These management actions and their associated mitigation measures are incorporated as conditions of this permit;

10. The following additional conditions shall be implemented by OMKM and TMT:

. . .

- Working with OMKM to develop and implement a habitat restoration study;

. . .

- Providing $1 million annually, adjusted for inflation, for "Community Benefits Package" which will commence with construction and continue through the term of the sublease. The package will be administered via The Hawaiʻi Island New Knowledge (THINK) Fund Board of Advisors; and

- Partnering with other institutions to implement a Workforce Pipeline Program, headed by at least one full-time position through the Community Outreach office, to prepare local residents for jobs in science, engineering, and technical fields;

. . .

- The applicant will present a plan for handling

> recreational parking during construction to the OCCL for review and approval prior to beginning construction;
>
> . . .
> • The Archaeological Monitoring Plan will be submitted to the State Historic Preservation Division for review and approval prior to the onset of construction;
>
> . . .
> 15. The applicant understands and agrees that this permit does not convey any vested rights or exclusive privilege;
> 16. In issuing this permit, the Department and Board have relied on the information and data that the applicant has provided in connection with this permit application.  If, subsequent to the issuance of this permit, such information and data prove to be false, incomplete or inaccurate, this permit may be modified, suspended or revoked, in whole or in part, and/or the Department may, in addition, institute appropriate legal proceedings;
>
> . . .
> 20. No construction work shall be initiated until the applicant demonstrates compliance with all pre-construction conditions and mitigation measures outlined in this report.  Once this condition has been satisfied, the Department will issue notice to proceed with construction;
> 21. If a contested case proceeding is initiated, no construction shall occur until a final decision is rendered by the Board in favor of the applicant or the proceeding is otherwise dismissed;
>
> . . .
> 25. Failure to comply with any of these conditions shall render this Conservation District Use Permit null and void.

This correspondence further asked UHH to acknowledge receipt of "this approval," and advised that BLNR had decided to hold a contested case hearing.

## 2.  Contested Case Hearing

Beginning in August 2011, a hearing officer appointed by BLNR's Chair presided over a contested case hearing, during which voluminous written direct testimony was admitted, and

twenty-six witnesses, under oath, testified and were cross-examined. The following is a brief summary of the issues raised by the evidence and arguments presented.

Perry White, the principal author of UHH's application, testified that in crafting the application, he relied upon the final environmental impact statement (FEIS) that had been approved by the Governor in 2010 and the Mauna Kea Comprehensive Management Plan and its four sub-plans, the Natural Resources Management Plan, the Cultural Resources Management Plan, the Decommissioning Plan, and the Public Access Plan. White further testified to the reasons he believed that TMT satisfied HAR § 13-5-30(c),[5] which contains criteria for BLNR's approval of a

---

[5]  HAR § 13-5-30(c) provides:

In evaluating the merits of a proposed land use, the department or board shall apply the following criteria:
(1) The proposed land use is consistent with the purpose of the conservation district;
(2) The proposed land use is consistent with the objectives of the subzone of the land on which the use will occur;
(3) The proposed land use complies with provisions and guidelines contained in chapter 205A, HRS, entitled "Coastal Zone Management", where applicable;
(4) The proposed land use will not cause substantial adverse impact to existing natural resources within the surrounding area, community, or region;
(5) The proposed land use, including buildings, structures, and facilities, shall be compatible with the locality and surrounding areas, appropriate to the physical conditions and capabilities of the specific parcel or parcels;
(6) The existing physical and environmental aspects of the land, such as natural beauty and open space

(continued...)

permit, and in particular, how he believed that the TMT project would not cause "substantial adverse impact."  White also testified regarding future decommissioning of Mauna Kea observatories, including TMT.

Dr. Gary Sanders, the TMT Project Manager, testified that TMT's design was developed in consultation with the Office of Mauna Kea Management.  He testified extensively regarding measures intended to mitigate the impact of TMT, including a reflective exterior dome that fit tightly around the telescope to minimize visual impact.  Dr. Sanders also testified that TMT was designed for a service lifetime of fifty years, while acknowledging that UH's lease of the land from the State expired in 2033.  Dr. Sanders also responded to questions regarding whether TMT would cause a permanent alteration or disturbance to the natural landscape at the TMT site, acknowledging that "there will likely be some permanent alteration."

James Hayes, of an engineering firm contracted to prepare the FEIS, testified regarding the anticipated visual

---

[5](...continued)
characteristics, will be preserved or improved upon, whichever is applicable;
(7) Subdivision of land will not be utilized to increase the intensity of land uses in the conservation district; and
(8) The proposed land use will not be materially detrimental to the public health, safety, and welfare.

impact, level of "cumulative impact" in light of existing telescopes on Mauna Kea, and several mitigation measures incorporated in the design of TMT. More specifically, Hayes testified that TMT would add only a "limited increment to the level of cumulative impact that currently exists on Mauna Kea, but it will not tip the balance of any assessed impact from a level that is currently less than significant to a significant level." Indeed, the FEIS stated, "From a cumulative perspective, the impact of past and present actions on cultural, archaeological, and historic resources is substantial, significant, and adverse; these impacts would continue to be substantial, significant, and adverse with . . . [TMT] and other reasonably foreseeable actions." Hayes further testified that placing TMT on a recycled telescope site was considered but ultimately deemed "not feasible."

Wallace Ishibashi, Jr., a member of the Kealoha Poliʻahu family, a lineage traditionally recognized as descendants of Poliʻahu, a snow goddess of Mauna Kea, testified that upon asking Poliʻahu whether TMT was "compatible with the sacred landscape," he was informed that "it was okay." Ishibashi further testified in writing that due to his experience learning from navigator Nainoa Thompson and from his grandfather about the stars and the moon and the importance of the study of

the heavens to ancient Hawaiians, he supported the TMT because he believed that it would help his grandchildren "learn more about ourselves, our God, and what's out there beyond the stars that we can see with only our eyes."  He compared TMT's advanced search for knowledge and understanding to a search for the aumakua or ancestral origins of the universe, and expressed disagreement with those who "oppose[d] things like the TMT on Mauna Kea just because it's a modern thing, as Hawaiians have always been a creative and adaptive people."

Kealoha Pisciotta explained in her opening statement that in Native Hawaiian cosmology, Mauna Kea is an origins place. "[I]t's where the heaven and the earth come together, where all life forms originated from. . . .  It is a temple, but one not made by man but for man, so that man could learn the ways of the heavens and the laws of this earth, which mean how do we live with each other; how do we live in relationship to the earth; how do we live in relationship to the heaven."

Dr. J. Kehaulani Kauanui, a Professor of Anthropology and American Studies at Wesleyan University, testified that telescope development on Mauna Kea had "proliferate[d]" beyond levels anticipated in the general lease from the State and the 1983 Master Plan for Mauna Kea.  Professor Kauanui added that TMT constituted 21st century colonialism, and that observatories on

19

Mauna Kea "literally supplant our indigenous temple of worship," and are a "desecration."

Marti Townsend, Program Director of KAHEA: The Hawaiian Environmental Alliance, testified that TMT would negatively affect the viewplanes of cultural practitioners, and that telescopes on Mauna Kea negatively affected cultural practices and the environment.  Townsend further testified that the mitigation measures proposed did not address "substantial adverse impacts" identified in the FEIS and CDUA because the majority of the measures were only indirect, speculative, and beneficial to "particular groups."

In closing, Appellants and UHH presented arguments, among other things, regarding whether Appellants' due process rights had been violated.  Pisciotta argued:

> I have to note here that in this case BLNR approved the TMT CDUA prior to conducting a contested case hearing, which we believe violated our due process rights, potentially shifting the burden of proof, and thereby forcing us to have to change BLNR's mind, rather than BLNR listening with an open mind to hear all evidence.

UHH responded as follows:

> Let me start with the claim that somehow the Applicant has relied on the approval of the CDUA for the CDUP for the permit in February.  Again, we never relied on that.  In fact, we agreed--we accepted the condition where there would be no action taken on it.  In fact, we never raised that as an issue in terms of certain things that we accepted.
> And we didn't shift--the burden of proof did not shift.  The University agreed and has continued to agree to accept the burden of proof of the eight

20

> criteria for the issuance of a CDUP which we believe
> the record has clearly shown, and the evidence that
> was submitted clearly supports the issuance of a CDUP.

On November 30, 2012, the hearing officer issued his 124-page findings of fact, conclusions of law, and decision and order, which stated that "the CDUA is GRANTED, and a Conservation District Use Permit is issued," subject to conditions.  Other than omission of the condition that if a contested case hearing be held, then construction shall be stayed, all conditions in the hearing officer's order were virtually the same as those in BLNR's March 3, 2011 letter nearly twenty-one months earlier.  As germane to the issue before this court, the hearing officer concluded that BLNR's approval of the permit prior to the contested case hearing was consistent with HAR § 13-1-28(b) (2009).[6]  Appellants objected to this and other findings and conclusions before BLNR.  Voluminous briefings were filed and BLNR held a hearing.

On April 12, 2013, BLNR issued its 126-page findings of fact, conclusions of law, and decision and order (BLNR's FOFs/COLs/D&O), stating that "the CDUA is GRANTED, and a Conservation District Use Permit is issued," subject to conditions.  In appearance and substance, BLNR's FOFs/COLs/D&O is

---

[6]    HAR § 13-1-28(b) provides:  "The contested case hearing shall be held after any public hearing which by law is required to be held on the same subject matter."

21

substantially the same as the hearing officer's findings, conclusions, and decision and order.

BLNR addressed Appellants' procedural argument by characterizing the February 25, 2011 decision as a "preliminary ruling" that complied with the Department of Land and Natural Resources' (DLNR) Rules of Practice and Procedure, including HAR § 13-1-28(b).  BLNR concluded that there was no due process violation because (1) the February 25, 2011 meeting was a "preliminary approval" and not a "final agency action," (2) the "preliminary approval" was conditioned upon the outcome of the contested case hearing and thus gave Appellants an opportunity to be heard, and (3) the prescribed sequence in the procedural rule was followed because public hearings preceded the contested case hearing:

> [COL] 225.  In a preliminary ruling by the BLNR, the CDUP was granted and the following condition was simultaneously imposed by the BLNR:  "If a contested case proceeding is initiated, no construction shall occur until a final decision is rendered by the Board in favor of the applicant or the proceeding is otherwise dismissed."  Immediately thereafter, on its own motion, the BLNR voted to direct that a contested case be held, and provided a date for interested parties to petition to participate in the contested case.  The condition quoted above is formalized as Condition 21 in the BLNR's March 3, 2011 letter to the University.  Thus, the BLNR retained responsibility to review and accept, reject, or modify the Hearing Officer's proposed findings and conditions.  By immediately ordering that a contested case be held and prohibiting construction until, if ever, it rendered its "final decision" in favor of the applicant following the conclusion of the contested case proceeding, the BLNR demonstrated that its February 25, 2011 vote and subsequent March 3, 2011 letter

22

constituted a preliminary ruling and did not reflect any final agency action.

. . .

[COL] 228.  In their brief in the contested case proceeding, [Appellants] did not argue that the contested case hearing should have been held before the BLNR voted on the CDUA.  They did, however, mention that issue, at least in passing, during closing arguments.  [Appellants'] position is not supported by the DLNR's Rules of Practice and Procedure, which specifically provide for a contested case hearing to occur after the public hearing on the matter, and not before.  Thus, Haw. Admin. R. § 13-1-28(b) states:  "The contested case hearing shall be held after any public hearing which by law is required to be held on the same subject matter."  (Emphasis added [sic].)[7]  The order of proceedings here complied with that rule.

[COL] 229.  In any event, [Appellants] cannot plausibly claim that they have been deprived of due process or, indeed, that they have suffered any harm at all by the order of proceedings.  The condition imposed by the BLNR and quoted above mandated that no work be done on the TMT Project until the contested case has concluded and the BLNR has finally resolved the matter in UHH's favor.  That condition has been honored.  The Hearing Officer was promptly appointed, and the contested case was held in due course.  The Project remains in abeyance pending the outcome of this process.  The BLNR must still vote on this matter.  The BLNR has at all times retained the authority to review and accept, reject, or modify the Hearing Officer's proposed findings and conclusions, and until the BLNR has voted again, there has been no final agency action on this application.  For all practical purposes, [Appellants] are exactly where they would have been if the process had not followed the BLNR's Rules of Practice and Procedure, but instead had occurred in the manner they desired.

(Internal exhibit citation omitted).

## B.  Appeal and secondary appeal

Appellants appealed BLNR's FOFs/COLs/D&O to the circuit court, continuing to argue that BLNR's approval of the CDUA and

---

[7]    This portion of BLNR's FOFs/COLs/D&O contains no emphasis.

issuance of the CDUP before a contested case hearing was inconsistent with Appellants' rights to due process and pertinent statutes and rules.

On May 5, 2014, the circuit court entered a decision and order affirming BLNR's FOFs/COLs/D&O, and entered final judgment.[8]  The circuit court reasoned that "BLNR granted a contested case hearing essentially simultaneously with the preliminary grant of the CDUP[,]" and that the 2011 "preliminary grant" "depended upon a final grant of the permit after a contested case hearing."  In addition, the circuit court reasoned that the "preliminary grant" in 2011 "did not have such a legal consequence" that a contested case hearing was required to have preceded it, and Appellants were not prejudiced because a contested case hearing was held and construction had been stayed.  Appellants appealed and sought transfer to this court, which we granted.

## II.  STANDARD OF REVIEW

In this secondary appeal, this court applies the standards of HRS § 91-14(g) to determine whether the circuit court decision was right or wrong.  <u>Korean Buddhist Dae Won Sa Temple of Hawaiʻi v. Sullivan</u>, 87 Hawaiʻi 217, 229, 953 P.3d 1315,

---

[8]    The Honorable Greg K. Nakamura presided.

24

1327 (1998). HRS § 91-14(g) (Supp. 2015) provides:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
> (1) In violation of constitutional or statutory provisions; or
> (2) In excess of the statutory authority or jurisdiction of the agency; or
> (3) Made upon unlawful procedure; or
> (4) Affected by other error of law; or
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Further, "[u]nder HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6)." Bragg v. State Farm Mut. Auto. Ins. Co., 81 Hawaiʻi 302, 305, 916 P.2d 1203, 1206 (1996).

### III. DISCUSSION

#### A. Due process of law

The Hawaiʻi Constitution provides, "No person shall be deprived of life, liberty or property without due process of law . . . ." Haw. Const. art. I, § 5. Due process "calls for such procedural protections as the particular situation demands."

Sandy Beach Def. Fund, 70 Haw. at 378, 773 P.2d at 261 (citations and internal quotations omitted).  The requirements of due process are flexible and depend on many factors, but "there are certain fundamentals of just procedure which are the same for every type of tribunal and every type of proceeding[,]" including those before administrative agencies.  Sifagaloa, 74 Haw. at 189, 840 P.2d at 371 (quoting Sussel v. City & Cnty. of Honolulu Civil Serv. Comm'n, 71 Haw. 101, 107, 784 P.2d 867, 870 (1989)).

The basic elements of procedural due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner.  Sandy Beach Def. Fund, 70 Haw. at 378, 773 P.2d at 261; In re Guardianship of Carlsmith, 113 Hawaiʻi 236, 240, 151 P.3d 717, 721 (2007) (due process "afford[s] [interested parties] an opportunity to present their objections").  However, while "a fair trial in a fair tribunal is a basic requirement of due process," Sifagaloa, 74 Haw. at 189, 840 P.2d at 371 (quoting Murchison, 349 U.S. at 136 (internal quotation marks omitted)), giving a person "a day in court" does not alone mean that a process is fair, State v. Brown, 70 Haw. 459, 463, 776 P.2d 1182, 1185 (1989).

Fundamentally, in the justice system, "justice can perform its high function in the best way only if it satisfies the appearance of justice."  Sifagaloa, 74 Haw. at 189, 840 P.2d

26

at 371 (quoting <u>Offutt v. United States</u>, 348 U.S. 11, 14 (1954))

(internal quotation marks and brackets omitted; emphasis added).

> In the administration of justice by a court of law, no principle is better recognized as absolutely essential than that every case, be it criminal or civil, and the parties involved therein are entitled to the "cold neutrality of an impartial judge." . . . In the words of Mr. Justice Cardozo, . . . "But justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."

<u>Peters v. Jamieson</u>, 48 Haw. 247, 262-63, 397 P.2d 575, 585 (1964)

(quoting <u>Snyder v. Massachusetts</u>, 291 U.S. 97, 122 (1934)).

This means that the manner in which the justice system operates must be fair and must also appear to be fair. <u>Sifagaloa</u>, 74 Haw. at 190, 840 P.2d at 371 ("[J]ustice must not only be done but must manifestly be seen to be done[.]") (quotations omitted). Indeed, this "stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." <u>Murchison</u>, 349 U.S. at 136. These principles of the justice system--mandated by the United States and Hawaiʻi Constitutions, statutes, administrative rules, and decisions by the courts--are manifested in procedural protections.

In an adjudicatory proceeding before an administrative agency, due process of law generally prohibits decisionmakers

27

from being biased, and more specifically, prohibits decisionmakers from prejudging matters and the appearance of having prejudged matters.  See Sussel, 71 Haw. at 109, 784 P.2d at 871 (concluding that where an adjudicator's actions while presiding over a matter gave rise to an appearance of impropriety, the circuit court erred in not enjoining the adjudicator from deciding the case); Withrow v. Larkin, 421 U.S. 35, 47 (1975) ("Not only is a biased decisionmaker constitutionally unacceptable, but 'our system of law has always endeavored to prevent even the probability of unfairness.'") (quoting Murchison, 349 U.S. at 136); see also Cinderella Career & Finishing Schs., Inc. v. FTC, 425 F.2d 583, 591 (D.C. Cir. 1970) (holding that the standard for evaluating the existence of improper prejudgment in an adjudicative context is whether "a disinterested observer may conclude that (the agency) has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it").[9]

"Indeed, if there exists any reasonable doubt about the adjudicator's impartiality at the outset of a case, provision of the most elaborate procedural safeguards will not avail to create

---

[9]     UHH argues that the Cinderella standard is "obsolete and generally rejected."  As explained in Section C, UHH is incorrect.  The Cinderella standard continues to be widely accepted across the country, and moreover, is consistent with Hawaiʻi Supreme Court decisions.

[an] appearance of justice."  Sussel, 71 Haw. at 108, 784 P.2d at 870 (quoting M. Redish & L. Marshall, Adjudicatory Independence and the Values of Procedural Due Process, 95 Yale L.J. 455, 483-84 (1986)); see Sifagaloa, 74 Haw. at 190, 840 P.2d at 371 (same); see also Cinderella, 425 F.2d at 590 (disapproving of circumstances "which give the appearance that [a decisionmaker] has already prejudged the case and that the ultimate determination of the merits will move in predestined grooves").  It is abundantly clear that "[f]ew situations more severely threaten trust in the judicial process than the perception that a litigant never had a chance" due to "some identifiable potential bias."  Redish & Marshall, Adjudicatory Independence, 95 Yale L.J. at 483 (emphasis in original); see Williams-Yulee v. Florida Bar, 135 S.Ct. 1656, 1666 (2015) (stating that "public perception of judicial integrity" is a governmental interest of "the highest order") (quotations omitted).

Thus, this court must determine whether Appellants were given an opportunity to be heard at a meaningful time and in a meaningful manner when--despite their pending requests for a contested case hearing and specific requests to not issue a permit before such hearing--BLNR issued the permit before resolving those requests and conducting a contested case hearing.

"A contested case is an agency hearing that 1) is

29

required by law and 2) determines the rights, duties, or privileges of specific parties." Pele Def. Fund v. Puna Geothermal Venture, 77 Hawaiʻi 64, 67, 881 P.2d 1210, 1213 (1994); see HRS § 91-1(5). An agency hearing that is required by law "may be required by (1) agency rule, (2) statute, or (3) constitutional due process." Kaniakapupu v. Land Use Comm'n, 111 Hawaiʻi 124, 132, 139 P.3d 712, 720 (2006).

It is undisputed that Appellants were entitled to a contested case hearing. BLNR recognized as much when it voted unanimously to hold a contested case hearing after approving the permit. Indeed, a contested case hearing was required as a matter of constitutional due process. The right to exercise Native Hawaiian customs and traditions is explicitly protected by article XII, section 7 of the Hawaiʻi Constitution:

> The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupuaʻa tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

Appellants have argued throughout this case that the project will have significant negative effects on their Native Hawaiian cultural practices on Mauna Kea. For example, Appellant Neves testified that "[TMT] development in my sacred temple of religious practice will seriously interfere with my ability to

adore Mauna Kea." And in a jointly submitted letter, Appellant Mauna Kea Anaina Hou, Appellant Clarence Kukauakahi Ching, The Royal Order of Kamehameha, and Sierra Club wrote, "Mauna Kea is considered the Temple of the Supreme Being[,] the home of Na Akua (the Divine Deities), Na ʻAumakua (the Divine Ancestors), and the meeting place of Papa (Earth Mother) and Wakea (sky Father)."

Given the substantial interests of Native Hawaiians in pursuing their cultural practices on Mauna Kea, the risk of an erroneous deprivation absent the protections provided by a contested case hearing, and the lack of undue burden on the government in affording Appellants a contested case hearing, a contested case hearing was "required by law" regardless of whether BLNR had voted to approve one on its own motion at the February 25, 2011 meeting.[10] See Sandy Beach Def. Fund, 70 Haw. at 378, 773 P.2d at 261.

Once a contested case hearing is mandated, due process requires that the parties be given a meaningful opportunity to be heard. See Application of Hawaiʻi Elec. Light Co., 67 Haw. 425, 430, 690 P.2d 274, 278 (1984). In this case, BLNR's decision to vote on the permit prior to the contested case hearing denied Appellants a meaningful opportunity to be heard in both reality

_____

[10]  Moreover, Appellees never disputed Appellants' standing to assert article XII, section 7 rights and to file this appeal.

31

and appearance.

A contested case hearing affords parties extensive procedural protections similar to those afforded parties in a civil bench trial before a judge.  These protections include the opportunity to issue subpoenas for witnesses to testify under oath or produce documents, to cross-examine witnesses under oath, and to present evidence by submitting documents and testimony under oath in support of their positions.  See HAR §§ 13-1-32(c), (g); 13-1-33(a), (b); 13-1-35.  Moreover, a contested case hearing affords parties the opportunity to obtain and utilize the assistance of counsel, comment on how a site visit by the hearing officer should be conducted, review the written decision of the hearing officer, and challenge the hearing officer's decision both in writing and verbally at a hearing before BLNR.

These procedures are designed to ensure that the record is fully developed and subjected to adversarial testing before a decision is made.  Yet that purpose is frustrated if, as was the case here, the decisionmaker rules on the merits before the factual record is even developed.  Such a process does not satisfy the appearance of justice, since it suggests that the taking of evidence is an afterthought and that proceedings were merely "mov[ing] in predestined grooves." Cinderella, 425 F.2d at 590; see Sandy Beach Def. Fund, 70 Haw. at 378, 773 P.2d at

32

261. In this case, the procedural protections that were afforded during the contested case process simply cannot remedy the fact that the decisionmaker appeared to have already decided and prejudged the matter at the outset. Decisionmakers cannot decide matters on the merits before taking evidence.

Such a process threatens the reality of justice as well. As well-intentioned as the hearing officer may be, he or she knows BLNR's position on the permit before the first witness is sworn in. See Murchison, 349 U.S. at 136 (explaining that the "stringent rule [to avoid the appearance of prejudgment] may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties"). BLNR members were of course aware of the prior vote when the hearing officer's recommendation came before them.

BLNR's procedure in this case was also inconsistent with the statutory definition of a contested case hearing. HRS § 91-1(5) defines a contested case as "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined _after_ an opportunity for agency hearing." (Emphasis added). Plainly, BLNR should not have voted on the permit when it did.

In sum, BLNR put the cart before the horse when it

33

approved the permit before the contested case hearing was held.
Once the permit was granted, Appellants were denied the most
basic element of procedural due process--an opportunity to be
heard at a meaningful time and in a meaningful manner.  Our
Constitution demands more.

**B.    BLNR's February 25, 2011 decision was a determination on the merits**

        BLNR and UHH argue that the February 25, 2011 vote was
merely preliminary and tentative pending a contested case hearing
and repeat vote by BLNR.  To be clear, BLNR's approval of the
permit--"preliminary" or not--before the contested case hearing
was held violated Hawaii's constitutional guarantee of due
process.  Regardless, the record indicates that BLNR issued a
permit on that day that was operative and determined UHH's rights
and responsibilities, although with some aspects stayed pending
further action.

        BLNR's letter to UHH on March 3, 2011 stated that "on
February 25, 2011, the Board of Land and Natural Resources
approved Conservation District Use Permit (CDUP) HA-3568 for the
Thirty Meter Telescope at the Mauna Kea Science Reserve," subject
to conditions.  The permit contained 25 conditions for TMT, and
Condition 10 contained 18 bullet points of apparent sub-
conditions.  As noted below, many of the conditions denominated

34

the permit as "the" permit, and not merely a "preliminary" permit.  Specifically, conditions stated:  that representations in the environmental impact statement and CDUA "are incorporated as conditions of the permit[,]" (Condition 6); mitigation measures and management actions contained in other plans submitted with the CDUA "are incorporated as conditions of this permit[,]" (Condition 7); the TMT Management Plan, which was submitted with the CDUA, "is approved," and it and related plans "are incorporated as conditions of this permit[,]" (Condition 9); UHH understood and agreed that "this permit" did not convey vested rights[,] (Condition 15); "[i]n issuing this permit," DLNR and BLNR relied upon the CDUA, and "[i]f, subsequent to the issuance of this permit, such information and data prove to be false, incomplete or inaccurate, this permit may be modified . . . .[,]" (Condition 16); and failure to comply with "any of these conditions shall render this Conservation District Use Permit null and void[,]" (Condition 25).  Thus, "the permit" was effective as of February 25, 2011, and contained conditions that detailed when and how the permit holder could act.  Quite simply, "the permit" was issued as of that date.

BLNR and UHH argue that despite the 2011 permit's repeated statement that it is "the permit," the 2011 permit was only preliminary because construction was stayed pursuant to the

35

condition that, "If a contested case proceeding is initiated, no construction shall occur until a final decision is rendered by the Board in favor of the applicant or the proceeding is otherwise dismissed[,]" (Condition 21). However, construction was stayed due to a number of conditions, not only Condition 21. Specifically, various conditions explained that construction could not begin immediately because: UHH was required to submit construction and grading plans and specifications for approval and consistency with the "conditions of the permit and the declarations set forth in the permit application[,]" (Condition 5); UHH needed to submit for review and approval plans for handling recreational parking during construction and monitoring archaeological sites[,] (Condition 10); and UHH was required to "demonstrate[] compliance with all pre-construction conditions and mitigation measures outlined in this report. Once this condition has been satisfied, the Department will issue notice to proceed with construction[,]" (Condition 20). Indeed, these conditions preventing immediate construction in 2011 were repeated in the document that UHH and BLNR characterize as the operable permit--BLNR's FOFs/COLs/D&O in 2013. Thus, a stay on construction beginning immediately did not render the 2011 permit anything less than an operative permit that was issued on the merits of the CDUA.

Further, at least one condition--the annual funding for a community benefits package, (Condition 10)--was to "commence with construction."  That this condition would commence with construction also suggests that even without construction, the application had been approved and a permit had been issued.  If there was no operative permit until construction could begin, then it would not be reasonable or necessary to explain that funding the community benefits package need not begin until construction begins, meanwhile authorizing other aspects to commence immediately.[11]

Indeed, the February 2011 permit authorized at least some aspects of TMT to commence immediately.  For example, one condition stated:  "The following additional conditions shall be implemented by OMKM [the Office of Mauna Kea Management] and TMT: . . . Working with OMKM to develop and implement a habitat restoration study; . . . Partnering with other institutions to implement a Workforce Pipeline Program, headed by at least one full-time position through the Community Outreach office, to prepare local residents for jobs in science, engineering, and technical fields[,]" (Condition 10).  The permit did not stay these conditions, which are unrelated to construction.  That the

---

[11]    It is also notable that in 2011 and 2013 the permit was given the same number (HA-3568).  This further suggests that the 2011 permit was indeed an operative permit.

37

permit authorized aspects of TMT to commence immediately underscores that the effect and apparent intention of issuing the permit was a determination on the merits of the CDUA. The circuit court erred in concluding that the 2011 permit "did not have such a legal consequence" that a contested case was required to have preceded it.

Despite the above, BLNR and UHH also contend that the 2011 permit was only preliminary because a few minutes after BLNR issued the permit, BLNR decided to hold a contested case hearing. But, simply stated, sequence matters. Here, BLNR issued the permit despite pending requests for a contested case hearing and a right to such a hearing under the applicable rules and the Hawai'i Constitution, and only then decided to hold the hearing. This sequence plainly gives rise to the appearance of prejudgment and did not provide Appellants with a meaningful opportunity to be heard.

Further, the conditions enunciated in BLNR's FOFs/COLs/D&O in 2013 are virtually the same as those in the 2011 permit. This similarity is significant because BLNR appears to suggest that in 2011, BLNR anticipated serious consideration of evidence presented during the contested case hearing. But the similarity between the 2011 permit and the 2013 decision gives the appearance that less than full consideration was given to the

38

voluminous legal and factual arguments and materials presented in the contested case hearing. Such similarity "give[s] the appearance that [BLNR] ha[d] already prejudged the case and that the ultimate determination of the merits [had] move[d] in predestined grooves." Cinderella, 425 F.2d at 590.

In sum, the 2011 permit was a determination on the merits, even though Appellants were entitled to a contested case hearing. This gives rise to an appearance of prejudgment.

**C. UHH's and BLNR's arguments in defense of issuing the 2011 permit before the contested case hearing was held are unpersuasive**

UHH and BLNR make several arguments in defense of BLNR issuing the permit before a contested case hearing. However, none of those arguments are persuasive. Rather, the circumstances of this case give rise to the reality and appearance of impropriety, and thereby violate the Due Process Clause of article I, section 5 of the Hawaiʻi Constitution.

UHH begins by distinguishing this case from Kilakila ʻO Haleakalā v. Bd. of Land & Natural Res., 131 Hawaiʻi 193, 317 P.3d 27 (2013). UHH characterizes Kilakila as a case of "whether, where a formal contested case has been requested, an agency may nonetheless make a rights-determinative 'final decision' before ruling on the contested case request." UHH argues that because BLNR's 2011 decision was not "final," i.e.,

not "final agency action," <u>Kilakila</u> does not apply to this case. UHH also suggests that because in the instant case BLNR "simultaneously" granted a motion to hold a contested case hearing and issued the permit, this case is distinguishable from <u>Kilakila</u>, where BLNR did not make a decision on requests for a contested case hearing until its approval of the CDUA had been appealed two months later. As explained above, sequence matters. Here, BLNR issued an operative permit despite pending requests for a contested case hearing and a right to such a hearing under the applicable rules and the Hawaiʻi Constitution, and only then decided to hold such a hearing. This sequence--whether events were separated by two minutes or two months--plainly gives rise to the appearance of prejudgment, and denied Appellants the opportunity to be heard at a meaningful time and in a meaningful manner.

UHH next argues that because Condition 21 stayed construction on TMT, this case was unlike <u>Kilakila</u>, where BLNR approved the CDUA without staying construction. As explained above, it does not matter whether or not the permit was stayed. BLNR should not have issued the permit prior to holding a contested case hearing. Moreover, construction was stayed due to a number of conditions, and the 2011 permit authorized some aspects of TMT to commence immediately. A stay on construction

40

did not render the 2011 permit anything less than an operative permit that was issued on the merits.

UHH next argues that Appellant Clarence Kukauakahi Ching "agreed that BLNR could properly vote and issue a permit" before a contested case hearing so long as the permit was conditioned upon construction not proceeding before a contested case hearing was resolved in favor of UHH and BLNR took a final vote also in favor of UHH. (Emphasis in original). But this statement by a private citizen at a public meeting did not authorize BLNR to act inconsistently with the Hawaiʻi Constitution, particularly with regard to the other Appellants.

Relatedly, UHH highlights Appellants' assertions that BLNR's procedural error of issuing the permit before a contested case hearing "could and should be addressed by the Hearing Officer in the contested case the BLNR ordered." (Citing Ex. A-320 to the contested case hearing, at 11, 21, 31, 42) (Emphasis omitted). UHH appears to suggest that these assertions constitute Appellants' concession that BLNR's procedural error could be remedied after-the-fact. But these statements by Appellants in letters on March 7, 2011, after BLNR had issued the permit, did not retroactively authorize BLNR to violate Appellants' due process rights under the Hawaiʻi Constitution ten days earlier.

41

UHH also argues that because Appellants made these statements and participated in the contested case hearing, Appellants "got what they requested." This argument misstates the facts. As described, multiple Appellants strenuously objected at every opportunity to BLNR issuing the permit before a contested case hearing because they believed that such sequence would not allow for adequate and impartial consideration of the merits. When BLNR did otherwise and issued the permit at the February 2011 meeting, Appellants continued to challenge that procedure with letters in March 2011, and in addition, participated in the contested case hearing on the merits and made legal arguments to the hearing officer. BLNR's February 2011 decision effectively forced Appellants to take this approach after BLNR issued the permit. Accordingly, Appellants' participation in the contested case hearing does not constitute consent to suffer the consequences of BLNR's improper decision in February 2011, or a waiver of their ability to challenge it later.

UHH next refers to HRS § 91-14 in support of its argument that the February 2011 decision was merely preliminary.[12] This statute concerns the scope of courts'

_____

[12]     HRS § 91-14 provides, in pertinent part:

(continued...)

42

jurisdiction for appellate review of specific types of agency rulings. UHH makes two mistaken characterizations in support of its argument: first, characterizing the 2011 permit as "preliminary" as used in this statute, and second, characterizing Appellants' position as a direct challenge of the 2011 permit. Specifically, UHH argues that if the 2011 permit was as prejudicial as Appellants contend, then it was at least a "preliminary ruling of the nature that deferral of review . . . would deprive appellant of adequate relief," under HRS § 91-14, so the judicial review that Appellants seek has been waived because it was not sought "within thirty days after the preliminary ruling." See HRS § 91-14(a), (b).

However, UHH's reliance on this statute is flawed at the outset because UHH conflates two distinct concepts: the availability of judicial review at a particular time, and the

---

[12](...continued)

> (a) Any person aggrieved by a final decision and order in a contested case or <u>by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief</u> is entitled to judicial review thereof under this chapter; . . . .

> (b) Except as otherwise provided herein, proceedings for review <u>shall be instituted in the circuit court</u> . . . <u>within thirty days after the preliminary ruling or within thirty days after service of the certified copy of the final decision and order of the agency</u> pursuant to rule of court . . . .

(Emphases added).

43

question of whether the procedures followed by BLNR comported with due process.  Essentially, UHH attempts to utilize its substantive argument as to due process--that the 2011 permit was only tentative or "preliminary"--to make a procedural argument regarding the type of preliminary ruling for which a court has jurisdiction to review BLNR's actions.  These are distinct concepts, and the way in which UHH relies on HRS § 91-14 is inapposite to the issue before this court.

UHH's argument is also flawed because Appellants are not seeking to set aside the 2011 permit, rather, they are seeking to set aside BLNR's FOFs/COLs/D&O in 2013 based on the process that led to its adoption.  UHH's position would effectively require a party to a contested case hearing to appeal whenever a decisionmaker appears to engage in prejudgment of the matter at issue.  Thus, for example, it would appear to require an immediate appeal where a decisionmaker makes arguably improper extrajudicial statements about the merits of a case.  See, e.g., Cinderella, 425 F.2d at 584.  Requiring a party to appeal (or lose the right to do so) based on such indefinite circumstances would encourage piecemeal appeals, inconsistent with well established law.  See Mitchell v. State Dep't of Educ., 77 Hawaiʻi 305, 308, 884 P.2d 368, 371 (1994) (stating that an end served by the requirement of a requisite degree of finality of

44

agency decisions before appellate review is the avoidance of piecemeal litigation).  Here, it was not until after the contested case hearing did not lead to adequate relief that judicial review was appropriate.

Moreover, UHH's argument is not supported by a plain reading of this statute.  HRS § 91-14(b) provides that a party wishing to appeal shall appeal "within thirty days after the preliminary ruling <u>or within thirty days after service of the certified copy of the final decision and order of the agency</u>[.]" (Emphasis added).  Accordingly, even if the 2011 permit is characterized as a "preliminary ruling" under this statute, Appellants' appeal shortly after the "final decision and order of the agency" was appropriate.  Appellants did not waive a due process challenge by not immediately appealing after BLNR issued the 2011 permit.

UHH next defends the procedure here by generally arguing that it is analogous to other procedures that have been found to pass muster under due process in Hawaiʻi and elsewhere. However, as set forth below, UHH refers to no federal or state case--and this court finds none--similar to this case, where a decisionmaker ruled on the merits before hearing the evidence.

UHH contends that <u>Cinderella</u>, 425 F.2d 583, which prohibits appearance of the decisionmaker's "prejudgment in some

45

measure," sets a standard that is "obsolete and generally rejected." In support, UHH refers this court to <u>Amerada Hess Pipeline Corp. v. Regulatory Comm'n of Alaska</u>, 176 P.3d 667 (Alaska 2008), for the proposition that <u>Cinderella</u> is generally rejected, and <u>NEC Corp. v. United States</u>, 151 F.3d 1361 (Fed. Cir. 1998), for the proposition that the appearance of "prejudgment in some measure" is permissible so long as the decisionmaker does not have an "irrevocably closed mind." In so arguing, UHH mischaracterizes <u>Cinderella</u>'s continued broad acceptance across the country under appropriate circumstances and ignores well established principles throughout Hawaiʻi case law.

In <u>Cinderella</u>, a member of the Federal Trade Commission made a public statement on a pending adjudicative matter before the Commission rendered a decision. The United States Court of Appeals for the District of Columbia held that where prejudgment is alleged, the test for disqualification is "whether a disinterested observer may conclude that (the agency) has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." 425 F.2d at 591 (internal quotation marks omitted). The court added that "an administrative hearing must be attended, not only with every element of fairness but with the very appearance of complete fairness[.]" <u>Id.</u> (internal quotation marks omitted).

46

Before and after <u>Cinderella</u>, the commitment to an objective "appearance of fairness" test is consistent throughout Hawaiʻi judicial decisions.  For instance, in <u>Sifagaloa</u>, 74 Haw. 181, 840 P.2d 367, this court considered whether an employee's due process rights were violated.  The employee applied for disability retirement benefits as a member of the State Employees' Retirement System (ERS).  The ERS Board of Trustees, upon reviewing a decision submitted by the Medical Board, denied Sifagaloa's request for disability retirement benefits.  <u>Id.</u> at 186–87, 840 P.2d at 370.  The same Board of Trustees adjudicated his appeal from the Medical Board's decision and affirmed the denial.  <u>Id.</u> at 187-88, 840 P.2d at 370.  On appeal, the employee asserted that he was denied due process because the Board of Trustees had conflicting interests to award retirement benefits and to preserve the retirement fund, and this conflict gave rise to an appearance of impropriety whereby the Board of Trustees' impartiality might reasonably be questioned.  <u>Id.</u> at 188, 840 P.2d at 370–71.

This court observed that the Supreme Court in <u>Withrow</u> determined that the fundamentals of just procedure require impartiality of "administrative agencies which adjudicate as well as courts[,]" and concluded that there is "no reason why an administrative adjudicator should be allowed to sit with impunity

47

in a case where the circumstances fairly give rise to an appearance of impropriety and reasonably cast suspicion on his impartiality." Id. at 189-90, 840 P.2d at 371 (quoting Brown, 70 Haw. at 467 n.3, 776 P.2d at 1188 n.3).

Ultimately, this court concluded that: "[f]airly read, neither the facts . . . nor the generalized assertions made here about [the Trustees'] 'inconsistent' responsibilities prove an interest on [their] part in the outcome of the determinations made [on Sifagaloa's claim] sufficient . . . to overcome the 'presumption of honesty and integrity' that attaches by virtue of [their] office." Sifagaloa, 74 Haw. at 193, 840 P.2d at 372 (alterations and ellipses in original). Many other Hawaiʻi cases take this approach. See, e.g., In re Sawyer, 41 Haw. 270, 283 (Haw. Terr. 1956) ("A judge owes a duty not to withdraw from a case--however much his personal feelings may incline him to do so--where he is not legally disqualified, yet there may be circumstances that cast suspicion on the fairness of the judge proceeding in the case so that it may be advisable for a judge not technically disqualified to withdraw sua sponte."); Peters, 48 Haw. at 262-63, 397 P.3d at 585; Honolulu Roofing Co. v. Felix, 49 Haw. 578, 617, 426 P.2d 298, 323 (1967) (quoting Sawyer); Brown, 70 Haw. at 462-63, 776 P.3d at 1185; Sussel, 71 Haw. at 106, 784 P.2d at 869 (describing Honolulu Roofing's

48

reference to <u>Sawyer</u> as "urg[ing] the circuit court to apply 'an appearance of impropriety' test in the situation at hand and disqualify the commissioners"); <u>State v. Ross</u>, 89 Hawaiʻi 371, 377, 974 P.2d 11, 17 (1998) (relying on <u>Brown</u>); <u>In re Estate of Damon</u>, 119 Hawaiʻi 500, 508, 199 P.3d 89, 97 (2008) (relying on, <u>inter alia</u>, <u>Sussel</u>, <u>Brown</u>, <u>Offutt</u>, <u>Murchison</u>, <u>Withrow</u>, and the Revised Code of Judicial Conduct in discussing the prohibition of even the appearance of impropriety).

The <u>Cinderella</u> standard also remains in use across the country.  <u>See, e.g.</u>, <u>Fogo De Chao (Holdings) Inc. v. United States Dep't of Homeland Sec.</u>, 769 F.3d 1127, 1149 (D.C. Cir. 2014); <u>McClure v. Indep. Sch. Dist. No. 16</u>, 228 F.3d 1205, 1216 n.8 (10th Cir. 2000); <u>Stivers v. Pierce</u>, 71 F.3d 732, 741, 747 (9th Cir. 1995).

Nevertheless, UHH refers this court to <u>Amerada</u>, where the Alaska Supreme Court explained its view that the <u>Cinderella</u> standard "most squarely stands"--notably in the present tense--"for the proposition that intemperate public remarks by a decisionmaker create a constitutionally impermissible appearance of outcome-determinative prejudgment."  <u>Amerada</u>, 176 P.3d at 674, 676.  It characterized <u>Cinderella</u> as a "public-foot-in-mouth case," and noted that "public intemperance [was] so central" to the decision that, it "can best be viewed as [a] response[] to

49

egregious official obnoxiousness which gratuitously undermines public trust." Id. at 674, 676. According to Amerada, Cinderella did not set an "across-the-board standard[] for all agency prejudgments of arguably adjudicative facts." Id. at 676. Amerada involved allegations that a commission's decision concerning the Trans Alaska Pipeline was tainted because one of the commission's staff persons previously wrote a master's thesis regarding that pipeline system. Id. at 672. The Amerada court was critical of the Cinderella test, calling it vague, "unduly abstract and impractical," and inconsistent with a presumption of regulatory propriety, and referred to federal cases in support of its critique. Id. at 675-76. Ultimately, though, the Amerada court applied the Cinderella standard in evaluating the due process claim under the United States Constitution: "This situation does not approach that zone of egregiousness where federal courts discern a procedural due process violation based on prejudgment bias relegating adjudication to 'predestined grooves.'" Id. at 676 (quoting Cinderella, 425 F.2d at 590).

Although the Alaska Supreme Court and some other jurisdictions have been critical of Cinderella, Hawaiʻi courts continue to embrace the dual requirements of the reality and the appearance of justice. Accordingly, UHH's argument that the Cinderella standard is generally rejected is both incorrect and

50

inconsistent with Hawaiʻi case law.  See, e.g., Sawyer, 41 Haw. at 270; Honolulu Roofing, 49 Haw. at 617, 426 P.2d at 323; Sussel, 71 Haw. at 106, 784 P.2d at 869; Sifaqaloa, 74 Haw. at 191, 840 P.2d at 372.

UHH next argues that rehearing of a matter by the same tribunal is a regular occurrence and does not violate due process.  (Citing FTC v. Cement Inst., 333 U.S. 683 (1948)).  In Cement Institute, a party alleged, one year after testimony had been concluded but "while . . . proceedings were still pending," prejudgment by members of the Federal Trade Commission who investigated the parties, submitted reports on the matters at issue to Congress and the President in accordance with law, testified before congressional committees in hearings related to their reports, and whose reports and testimonies indicated their opinions that were shaped while preparing the reports.  Id. at 700.  The Court concluded that the commission was not necessarily disqualified from the matter before it because (1) the party could still present evidence and argument before the Commission rendered its decision, id. at 701, (2) "the fact that the Commission had entertained such views as the result of its prior ex parte investigations did not necessarily mean that the minds of its members were irrevocably closed on the [issues]," id. at 701, (3) congressional purposes would be frustrated if commission

51

members could not have testified or reported, id. at 701-02, and (4) "judges frequently try the same case more than once and decide identical issues each time[,]" id. at 703.

Cement Institute is different from this case. Unlike the party in Cement Institute, Appellants were not afforded an opportunity to present evidence before BLNR rendered its decision on the merits. As discussed, an "irrevocably closed" mind is not the applicable standard under Hawaiʻi law. Rather, Hawaiʻi law is consistent with the Cinderella standard. Unlike Cement Institute, no act of Congress, statute, or even administrative rule would have been frustrated by BLNR holding a contested case hearing before deciding whether to issue the permit.

UHH refers to Cement Institute apparently in support of the notion that BLNR could "vote again" on the application after voting on it in 2011. But Cement Institute does not provide any guidance on the issue of whether BLNR's issuance of the permit before a contested case hearing gave rise to the appearance of impropriety.

UHH next refers to Nat'l Labor Relations Bd. v. Donnelly Garment Co., 330 U.S. 219 (1947), for the proposition that an administrative decisionmaker should not be excluded for prejudgment from rehearing a case merely because the decisionmaker previously excluded evidence that was later found

52

to have been erroneously excluded.  UHH also refers to Morgan v. Planning Dep't, Cnty. of Kauai, 104 Hawaiʻi 173, 86 P.3d 982 (2004), for the related proposition that agencies have "inherent authority to reconsider [their] own decisions."  (Quoting id. at 185, 86 P.3d at 994).  But the issue here is not BLNR rehearing or reconsidering anything.

UHH next refers to MacKay v. McAlexander, 268 F.2d 35 (9th Cir. 1959), and Pangburn v. Civil Aeronautics Bd., 311 F.2d 349 (1st Cir. 1962), for the propositions that an agency administrator who presides over a proceeding similar to and related to a prior proceeding, or who has had contact in a prior hearing with facts at issue in the hearing at bar, or who has taken a public position on facts, does not inherently violate due process under the United States Constitution.  Simply put, those propositions refer to different factual circumstances and do not guide disposition of this case.  The due process issue under the Hawaiʻi Constitution here concerns the propriety of BLNR issuing the permit at the outset in 2011, not what it did afterward.

In sum, although UHH defends the procedure here by generally arguing that it is analogous to other procedures that have been found to pass muster, no case put forth by UHH is analogous to the circumstances here.

UHH also defends the position that the hearing officer

53

and BLNR adopted in response to Appellants' argument that the sequence of issuing the permit before a contested case hearing was improper.  The hearing officer and BLNR, in their respective findings, conclusions, and orders in 2012 and 2013 stated that this sequence was authorized by HAR § 13-1-28(b) (2009).  This rule provides:  "The contested case hearing shall be held after any public hearing which by law is required to be held on the same subject matter."  HAR § 13-1-28(b).  Here, the contested case hearing was indeed held after public hearings.  Critically, however, and contrary to Lemmo's response to BLNR member Pacheco's question on the issue, this rule did <u>not</u> authorize BLNR to decide the merits and issue the permit before the contested case hearing, or before the request for a contested case hearing had been resolved.  In any event, due process would prohibit such a procedure.

It might be argued that the high level of detail over 126 pages of BLNR's FOFs/COLs/D&O demonstrates transparency that mitigates, albeit belatedly, an appearance of prejudgment.  Indeed, one benefit of a transparent articulation of the bases for decisions is the impression that the "processes were in fact meaningful to the outcome."  Redish & Marshall, <u>Adjudicatory Independence</u>, 95 Yale L.J. at 486 (internal quotation omitted, emphasis omitted).

54

That said, the similarity between the 2011 permit and the 2013 decision give the exact opposite impression, because this similarity exists despite what BLNR received in between: thousands of pages of written testimonies, exhibits, and factual and legal arguments, and dozens of hours of verbal testimonies and more legal arguments. As a result, the virtually indistinguishable documents of 2011 and 2013 give the impression that none of the testimonies, arguments, or evidence submitted to BLNR between the two were seriously considered. BLNR should not have issued the permit before the request for a contested case hearing had been resolved. The appearance of prejudgment continues.

UHH next argues that the remedy Appellants seek--remand to a new hearing officer for a new contested case hearing--reveals a flaw in Appellants' position. Specifically, UHH contends that even if a new hearing officer holds a new contested case hearing, the matter would again be presented to BLNR for a final vote, as it was in 2013, and thus would not resolve Appellants' challenge to BLNR's prejudgment. This argument is mistaken because Appellants do not challenge BLNR's ability to be fair and impartial (i.e., Appellants are not seeking recusal of any or all members of BLNR). Rather, Appellants contend and this court agrees that BLNR erred in the way it proceeded in 2011,

which is not necessarily indicative of how it may proceed upon remand with a clean slate.[13]

BLNR argues that when it approved the CDUA and issued the CDUP at the February 25, 2011 meeting, a request for a contested case hearing was not perfected, so BLNR did not ignore a procedurally-compliant request.  In support, BLNR refers to HAR § 13-1-29 (2009), which generally states that in addition to a request for a contested case hearing before the close of a board meeting, a written petition must also be filed soon after the board meeting.

BLNR generally reads this rule correctly, but the absence of a perfected request for a contested case hearing did not authorize BLNR to issue a permit before such contested case hearing might be granted or occur.  This is particularly so because there was no doubt that a contested case hearing would in fact be held, given (1) that Appellants were entitled to a contested case hearing under the applicable administrative rules and the Hawaiʻi Constitution; (2) numerous requests for a contested case hearing as early as the public hearings in

---

[13]    Moreover, this court takes judicial notice that none of the members of BLNR who voted on February 25, 2011 are currently members of BLNR. See Hawaiʻi Rules of Evidence Rule 201 (regarding judicial notice); Compare http://dlnr.hawaii.gov/boards-commissions/blnr/ (listing BLNR members as of October 20, 2015), with ROA 15, ICA Dkt. 60:4 (listing BLNR members who voted on February 25, 2011).

December 2010 and leading up to the February 25, 2011 meeting; (3) repeated requests during the February 25, 2011 meeting for a contested case hearing and specific requests to not issue a permit before such hearing; (4) Lemmo's apparent conclusion and recommendation that a contested case hearing should be held; and (5) BLNR's apparent agreement with Lemmo by deciding on its own motion that a contested case hearing should be held.

BLNR also argues that Appellants have not overcome the presumption that administrative adjudicators perform their duties with honesty and integrity.[14]  See Withrow, 421 U.S. at 47. Under the factual circumstances of this case as described above-- most notably, the appearance of impropriety created by the process employed by BLNR--this presumption does not warrant judgment in favor of BLNR.  See Murchison, 349 U.S. at 136 (stating that the requirement that proceedings must appear fair "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties").

In short, BLNR acted improperly when it issued the permit prior to holding a contested case hearing.  No case or

---

[14]     BLNR also refers this court to cases which generally state that due process does not require absolute "perfect[]" execution of procedural protections, and although this is true, this general statement does not warrant judgment in favor of BLNR under the circumstances of this case.

argument put forth by UHH or BLNR persuades otherwise.

## IV. CONCLUSION

For the foregoing reasons, this court vacates the circuit court's May 5, 2014 Decision and Order Affirming Board of Land and Natural Resources, State of Hawaii's Findings of Fact, Conclusions of Law and Decision and Order Granting Conservation District Use Permit for the Thirty Meter Telescope at the Mauna Kea Science Reserve Dated April 12, 2013, and final judgment thereon. This matter is remanded to the circuit court to further remand to BLNR for proceedings consistent with this opinion, so that a contested case hearing can be conducted before the Board or a new hearing officer, or for other proceedings consistent with this opinion.

| | |
|---|---|
| Richard Naiwieha Wurdeman<br>for appellants | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Ian L. Sandison,<br>Timothy J. Lui-Kwan,<br>John P. Manaut, and<br>Arsima A. Muller<br>for appellee University of<br>Hawaiʻi at Hilo | /s/ Sabrina S. McKenna |
| Douglas S. Chin,<br>William J. Wynhoff, and<br>Julie H. China<br>for appellees BLNR, DLNR, and<br>Suzanne D. Case, in her<br>official capacity as<br>Chairperson of the Board | |

